NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2021 IL App (4th) 200491-U

NO. 4-20-0491

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 7, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Jersey County |
| ROGER W. CARROLL JR., | ) | No. 18CF68 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Eric S. Pistorius, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Turner concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The appellate court affirmed defendant's conviction, finding the trial court did not err in its evidentiary rulings and defense counsel's performance was not deficient under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶ 2  In April 2018, the State filed an amended information against defendant, Roger W. Carroll Jr., charging him with six felonies associated with Bonnie Woodward's disappearance and death in June 2010. The State charged three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2010)), alleging defendant, in June 2010, without lawful justification and with the intent to kill Bonnie Woodward, shot her. First degree murder, a nonprobationable special class felony punishable by 20 to 60 years in prison (730 ILCS 5/5-4.5-20 (West 2010)), in this case included a possible minimum of 25 additional years if defendant was found to have personally discharged a firearm (730 ILCS 5/5-8-1(a)(1)(d)(3) (West 2010)). The second count alleged the same act but that defendant knew such an act created

a strong probability of death or great bodily harm to Bonnie Woodward thereby causing her death. Count III alleged defendant committed first degree murder while committing a forcible felony (aggravated kidnapping (720 ILCS 5/10-1(a)(3) (West 2010))) by shooting Bonnie Woodward (720 ILCS 5/9-1(a)(3) (West 2010)). The State also charged one count of aggravated kidnapping, a Class X felony (720 ILCS 5/10-1(a)(3) (2010)) and one count of concealment of a homicidal death, a Class 3 felony (720 ILCS 5/9-3.4(a) (West 2010)), but these counts were eventually dismissed before or during trial.

¶ 3        In March 2020, a jury found defendant guilty on all three first degree murder counts and found the personal discharge enhancement had been proved. In October 2020, the trial court sentenced defendant to 40 years in the Illinois Department of Corrections (DOC) on each count, to run concurrently with an additional 25-year enhancement for discharging a firearm. On appeal, defendant presents seven arguments: (1) the State's display of defendant's photograph to an eyewitness several weeks before trial constituted plain error; (2) the trial court's refusal to allow defendant's counsel to review Nathan Carroll's notes after an *in camera* inspection and an assertion of attorney-client privilege was error; (3) the admission of other-crimes evidence was error; (4) it was error for the trial court to limit defense counsel's cross-examination of Monica Carroll, which was intended to show a financial interest and bias; (5) admitting testimony regarding the family's attitude toward Nathan Carroll after testifying before the grand jury was error; (6) the trial court's failure to strike and admonish jurors to disregard bad character evidence was error; and (7) ineffective assistance of trial counsel. For the reasons set forth below, we affirm.

¶ 4                                        I. BACKGROUND

¶ 5        In April 2018, after several amendments, the State eventually filed an information charging defendant with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (2) (West 2018)), one count of concealment of a homicidal death, and one count of aggravated kidnapping. The aggravated kidnapping and concealment of a homicidal death counts were eventually dismissed prior to the verdict.

¶ 6        In February 2020, at a final pretrial hearing, several motions *in limine* were addressed. The State sought to present evidence of a domestic battery incident between defendant and his wife which occurred in March 2018 and resulted in a newfound focus on defendant as a suspect in the disappearance of Bonnie Woodward. In addition to the circumstances of the domestic battery, the State sought to introduce certain inculpatory statements defendant made to his wife during the incident as other-crimes evidence. The defense objected on two grounds: spousal communication privilege and any probative value being outweighed by the prejudicial impact. The trial court found the incident and statements admissible, and the State confirmed it would limit the wife's testimony surrounding the incident, as well as defendant's statements.

¶ 7        At trial, the State's first witness was Scott Golike, a lieutenant with the Alton Police Department, where he had been a police officer for over 27 years. Over the course of his law enforcement career, he had been involved with 65 to 75 homicide investigations. At the time of his testimony, he was a special investigator for the Madison County State's Attorney's Office. In 2010, he was chief of detectives and oversaw the Bonnie Woodward investigation. He testified to the various circumstances which led authorities to become suspicious about the unexplained disappearance of Bonnie Woodward in 2010. These included her unexplained absence from work, conversations with friends and family, and the fact that her truck was found

in her workplace parking lot, apparently abandoned, with the doors locked and windows down. Several employees said they observed an interaction between an unknown man and Bonnie in the parking lot sometime before she disappeared. Based on descriptions of the person and the vehicle he appeared to be driving, defendant became a suspect approximately one month after her disappearance. A search warrant was executed on defendant's property, and investigators seized firearms and ammunition, but the case went cold until March 2018 when defendant's neighbor contacted Golike, prompting him to contact Detective Nick Manns about defendant's then pending domestic battery investigation.

¶ 8        Golike laid the foundation for admission of a redacted version of defendant's interview with police. After defendant was Mirandized (see *Miranda v. Arizona*, 384 U.S. 436 (1966)), he was questioned both at his property and later after being transported to the station for a recorded interview. During the interview, defendant denied ever speaking with Woodward or being around, handling, or touching her vehicle. Toward the end of the interview, Golike asked, "Any chance your fingerprints would be on Bonnie's car on the driver's door? Like all over it. (inaudible). No chance?" Defendant responded, "[N]o, there's no way that my fingerprints are on that car door ***." Later in the trial, a fingerprint analysis expert with the Illinois State Police testified that a fingerprint and palmprint located on Woodward's truck door matched defendant's fingerprint card.

¶ 9        Nick Manns spent over 25 years in federal law enforcement before becoming a detective with the Jersey County Sheriff's Office in 2017. He testified that in March 2018, he received a report of defendant committing a domestic battery against his wife (Monica) and viewed photographs of her injuries. A police search for defendant in the Jerseyville area was unfruitful. Manns, being familiar with the area, drove by defendant's home after his shift, and he

- 4 -

found defendant lying unconscious in a wooded area far off the road. Found on defendant were a bag of syringes and insulin, which defendant later admitted using, intending to commit suicide because "he hurt his wife bad." While investigating the domestic battery, Manns learned from Detective Golike that defendant was suspected in Bonnie Woodward's disappearance 10 years earlier.

¶ 10        Nathan Carroll, defendant's son, now 25 years old, was 16 when Bonnie Woodward disappeared. He knew Bonnie's stepdaughter (Heather) through a church group. In June 2010, after Heather ran away from Bonnie's home, his father (defendant) offered to have Heather live with them until she was 18 and able to be on her own. Nathan, testifying under a grant of immunity, said he never met Bonnie but that defendant told him she "was a bad person" who was constantly "mean and aggressive and abusive" towards Heather and that Bonnie "needed to go away and never come back." When the family was vacationing with in-laws in late June 2010, defendant told Nathan that Bonnie "needed to die." Nathan testified he attempted to talk defendant out of doing anything but eventually, at defendant's direction, Nathan and he returned to Jerseyville a day earlier than his wife and Heather, who had accompanied them on the trip. Nathan said once they arrived, defendant drove to Bonnie's place of work, pointed at her truck, and said, "[G]ood[,] she is working today." Nathan testified defendant was familiar with Bonnie's work schedule because he had questioned Heather about what time Bonnie would typically arrive and leave for work. Nathan said once defendant arrived home from the trip, he showered, shaved, dressed, loaded his gun, and said, "[T]his has gotta happen whether you like it or not," before leaving. In preparation for the murder, Nathan erected a tent away from the house with the idea that defendant would tell Bonnie that Heather was staying inside the tent to lure Bonnie inside. When defendant returned, Nathan testified he heard eight or nine gunshots from

an area behind the garage. When he walked outside through the garage, he saw the lower part of human legs wearing tan "scrub pants." Defendant told him "not to go back there because it's ugly." He saw defendant start up the tractor, scoop the body up in the front loader, and dump the body in a large brush fire previously lit by Nathan. According to Nathan, when defendant showed him Bonnie's cell phone, Nathan took it, smashed it with a hammer, put it in a plastic bag, and threw it on the fire. Nathan and defendant both mowed the grass everywhere Bonnie's body had been and continually stoked the fire for several days.

¶ 11 After the fire burned out, defendant scooped up the remains with the tractor and dumped them in the creek. Nathan testified defendant talked about the murder with Nathan "[a]lmost nightly for a couple years," constantly telling him not to talk to police and to delete some text messages sent from Monica, which she later described as having been sent on the day Nathan and defendant returned home from vacation early, inquiring about what they were doing. Nathan admitted lying when first called to testify at the grand jury because he wanted to protect his father. During the course of his testimony before the grand jury, the prosecutor advised him his grant of immunity was in jeopardy if he failed to tell the truth. After speaking with his attorney, Nathan said he then began telling the truth about his and defendant's involvement in the murder and disposal of the remains of Bonnie Woodward. Over defense counsel's objection, Nathan testified that after his grand jury testimony, he received threats from family members and most of his father's family refused to speak with him. After this line of questioning, the testimony proceeded as follows:

"Q. Did your dad ever kill anything else on that property?

A. Yes.

Q. What?

A. Dogs.

Q. How many?

A. I can recall two on the property.

Q. Were they your dogs?

A. One of 'em.

Q. You know why he killed your dog?

[DEFENSE COUNSEL]: Object. May I approach, Your

Honor?"

¶ 12    The comments during the sidebar have been labeled "inaudible," and as a result, it is unclear whether the trial court sustained or overruled defense counsel's objection. Regardless, the prosecutor went on to a different area of questioning, and defense counsel requested no further remedy. Nathan told about being provided immunity for his testimony, and he said that over the course of time, after having attempted to block out much of what happened, he has remembered more details about the murder. On cross-examination, defense counsel questioned him about his grant of immunity and confronted him with his prior inconsistent statements before the grand jury. On redirect examination, the prosecutor inquired further:

"Q. The defense asked you if your memory gets better and
you said yes. Why does it get better in a situation like this? Explain
that to the jury.

A. I spent eight years trying to not think about this…trying
to go on and be normal and forget it…and in the past two
years…my goal is to remember everything I can…and someone
will say somethin' someone will bring up a topic and then it just

unrolls from there. I remember more and more information…and over these past few years I cannot think about the details all the time. I write it down…I share it in the meetings with the prosecutor and then I still have to try and function. So, yes my memory does get better as I'm remembering more things and more unravels…but after I tell people and I know it's documented I try and forget it again…and it's hard 'cause I think about it on a nightly basis."

This prompted a sidebar request from defense counsel, claiming surprise because although they had been provided over 40 pages of notes written by Nathan as part of the State's discovery compliance, they did not know about the particular notes to which Nathan referred. The State also indicated they were unaware of these notes as well.

¶ 13        The next day, defense counsel asked for a mistrial, claiming they should have had access to these notes and they only found out about them during Nathan's testimony. The State informed the trial court it spoke with Nathan's attorney and all of the notes Nathan referenced were notes he made while meeting with his attorney. The State also noted that a 30-to-40-page journal in its possession had already been disclosed to the defense and used during Nathan's cross-examination. The trial court pointed out defense counsel still had the ability to subpoena any relevant notes and material from Nathan's attorney and the court could conduct an *in camera* review to determine if the notes contained anything that should be disclosed to the parties.

¶ 14        Later, defense counsel indicated they had spoken with Nathan's attorney, who confirmed Nathan had made additional notes regarding his memory of the events but the attorney refused to provide those notes to counsel without a court order. The trial court recommended a

subpoena issue to Nathan's attorney so the trial court could conduct an *in camera* review of the notes in order to determine whether they were covered by attorney-client privilege. Defense counsel agreed to this process. Nathan's attorney eventually complied with the subpoena request and tendered copies of the requested notes from Nathan's notebook and his grand jury testimony with handwritten notes, both of which Nathan's attorney claimed were subject to attorney-client privilege. After an *in camera* inspection by the court, and after hearing the arguments of counsel, the court found the attorney-client privilege applicable and denied the defense access to Nathan's notes.

¶ 15        During the course of the trial, the State called several family members and friends of Bonnie Woodward who said the last time they saw or heard from Bonnie was the day she disappeared. They also said she had engaged in no online activity or financial transactions since that day. The State called witnesses from Bonnie's place of employment who testified about seeing her in the employee parking lot on June 25, 2010. She was seen sitting in her red truck with a man standing outside her truck door. Although none of the witnesses were able to identify defendant from a six-person photo lineup they were shown by the police at the time, one of the witnesses, Wanda Bausily, testified that on that day, as she was leaving work, she saw a man standing next to Bonnie's truck and saw his face as they "both looked at each other." As she drove away, she saw them standing next to a silver four-door car. She identified the defendant in open court as the man she saw standing next to Bonnie's truck that day. She explained she was unable to pick him out of the photo lineup in 2010 because, as she recalled, the men's pictures contained more facial hair. In fact, when shown a copy of what was represented to be the same lineup, she did not believe it was the same one shown to her 10 years before. On

cross-examination, she said she got a good look at defendant's face and was only 10 feet away from him at one point. Defense counsel then inquired:

"Q. And so, um, did the State's Attorney show you a photograph of [defendant] in preparation of your testimony?

A. Yes.

Q. Was it a black and white photo or a color photo?

A. It was color.

Q. Okay and did they tell you how old the photograph was that they showed to you?

A. I don't believe so. I don't remember for sure if she did or not.

Q. And when did she show you this photograph?

A. Uh, it's been about a month ago I guess.

Q. And how large was the photograph?

A. It was on a screen.

Q. Like on *** a TV screen, like this?

A. On a laptop.

Q. And was that the only picture you saw of *** a male that they identified as being [defendant]?

A. Yes but I remember him, I mean, like I said this doesn't look like the photo. I know the man that I saw and I have pointed him out."

When defense counsel sought to clarify how Bausily had been shown defendant's photo for the first time a month before trial, she also revealed that she had been seeing him on social media over the last 10 years, ever since Bonnie's disappearance had made the news.

On redirect examination, the State asked Bausily to repeat what she had said when shown the photograph a month before trial. She responded:

> "A. I told you that *** was definitely the man that I would never forget his face and his eyes kinda [*sic*] told it all. That photo lineup doesn't look like the one I saw 10 years ago when I happened [*sic*] but I know who I saw and I know for a fact that that's him sittin' at the end of the table there."

¶ 16　　　　Monica Carroll, defendant's wife, testified she and defendant were currently going through a divorce. She said that upon returning to Jerseyville from the vacation at her parents' home in June 2010, she saw a large brushfire which burned continuously for six or seven days while being repeatedly stoked by defendant and Nathan. She also saw both of them use the tractor to scoop up the ashes from the brushfire and take them down over the hill to the creek. When she was asked about the domestic violence incident in March 2018, she said she was preparing to leave for work one morning when defendant suddenly grabbed her by the hair and struck her in the head, neck, and across the face "10 or 12" times with a Taser. Defendant told Monica he "had killed for [her]" and that he was a monster. He admitted to Monica that he used to be able to control his anger "but he couldn't anymore." Monica said she was able to convince defendant to let her leave, and she immediately drove to the Jersey County Sheriff's Office to report the incident.

¶ 17        On cross-examination, defense counsel questioned Monica about her pending divorce and asked, "would you say the assets that are involved in the divorce are worth about $800,000?" prompting a relevance objection from the State and a sidebar conference with the trial court. Defense counsel argued the question was relevant to show a financial motivation for Monica's testimony if she thought she may get a larger percentage of the marital assets if defendant went to prison. The trial court refused to allow the inquiry to continue in the presence of the jury until it was determined whether she in fact believed that to be the case. Proceeding outside the jury's presence, counsel asked Monica whether she believed a conviction of the defendant would affect the share of marital assets she might receive. Her response was "no." Based on that, the trial court told counsel, "Then you can ask that question and that's your answer and then we're done with that subject. Okay?" To which defense counsel responded, "Yes, sir." Once the jury returned, counsel asked the question, received the negative response, and moved on.

¶ 18        Evidence was presented about the multiday search and excavation of defendant's property in April 2018 attempting to find Bonnie Woodward's body. A 9-millimeter cartridge, shell casing, and projectile were located within the area where Bonnie Woodward was reportedly murdered. Throughout the excavation of defendant's property, the search team located over 25 bone fragments. Forensic scientists with the Illinois State Police testified the projectile and shell casing had been fired from the Stoeger handgun taken from defendant's residence. The parties stipulated to a Federal Bureau of Investigation (FBI) report which said some of the bone fragments found could not be excluded from being considered of human origin. A forensic archeologist described some of the bone fragments as having been subjected to "extreme burning" and were consistent with "incomplete cremation." Although some fragments were

found to contain deoxyribonucleic acid (DNA), the scientist said it did not match that of Bonnie Woodward. He also concluded from finding bone fragments in different locations on defendant's property that they were scattered across the ground surface, working their way into the ground over time.

¶ 19　　　　　A research botanist for the United States Department of Agriculture Forest Service testified he received samples from a tree located near where defendant and Nathan set the brushfire. After analyzing the tree rings in the samples provided, his opinion was the tree "clearly experienced a traumatic event during the *** wood growth season of 2010."

¶ 20　　　　　A final stipulation, read to the jury before the State rested, said that after defendant's laptop was seized, the term "Bonnie" was found several hundred times after June 25, 2010, but appeared zero times on the hard drive prior to her disappearance date of June 25, 2010.

¶ 21　　　　　After deliberating for 3½ hours, the jury found defendant guilty of first degree murder and found the statutory enhancement for personally discharging a firearm causing death was proved. Defendant's motion for a new trial raised most of the claims he asserts here excluding the objection to testimony about killing dogs on the property and several of the ineffective assistance of counsel claims. The trial court denied defendant's motion for a new trial. At sentencing in October 2020, after hearing victim impact statements and the recommendations of counsel, the court sentenced defendant to 40 years in prison on each first degree murder count, to run concurrently, with an additional 25-year enhancement for the use of a firearm, totaling 65 years in DOC.

¶ 22　　　　　This appeal follows.

¶ 23　　　　　　　　　　　　　　II. ANALYSIS

¶ 24    Defendant raises seven issues on appeal: (1) the State's display of defendant's photograph to an eyewitness several weeks before trial constituted plain error; (2) the trial court's refusal to allow defendant's counsel to review Nathan Carroll's notes after an *in camera* inspection and an assertion of attorney-client privilege was error; (3) the admission of other-crimes evidence was error; (4) it was error for the trial court to limit defense counsel's cross-examination of Monica Carroll, which was intended to show a financial interest and bias; (5) admitting testimony regarding the family's attitude toward Nathan Carroll after testifying before the grand jury was error; (6) the trial court's failure to strike and admonish jurors to disregard bad character evidence was error; and (7) ineffective assistance of trial counsel. We take each issue in turn.

¶ 25                    A. Improper Pretrial Lineup

¶ 26    Defendant claims plain error occurred when Wanda Bausily testified on cross-examination that she viewed defendant's photo on the State's laptop approximately one month before trial. Defendant claims this constituted a "lineup" and two errors flowed from it. First, the State failed to follow the statutory lineup procedure when showing Bausily the photo, and second, it failed to disclose this "lineup" to defense counsel pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Defendant's sub-arguments are all predicated on these two claims. Because we do not agree the State's actions constituted a lineup or that displaying a defendant's photo to a witness would constitute *Brady* material, we find there was no error, and we do not reach the merits of his additional sub-arguments.

¶ 27    Despite raising the issue in a posttrial motion, defendant failed to object at trial during Bausily's testimony. "Ordinarily, a defendant must both specifically object at trial and raise the specific issue again in a posttrial motion ***." *People v. Woods*, 214 Ill. 2d 455, 470,

828 N.E.2d 247, 256-57 (2005). "The failure to object to alleged error at trial *and* raise the issue in a posttrial motion ordinarily results in the forfeiture of the issue on appeal." (Emphasis added.) *People v. Allen*, 222 Ill. 2d 340, 350, 856 N.E.2d 349, 355 (2006). However, the rule of forfeiture of appellate issues is a limitation on the parties, not the appellate court. *People ex rel. Resnik v. Curtis & Davis, Architects & Planners, Inc.*, 58 Ill. App. 3d 28, 31, 373 N.E.2d 772, 774 (1978). Because defendant's failure to raise a trial objection does not limit our ability to review the issue, we elect to do so.

¶ 28         Under plain error, reviewing courts may, in the exercise of their discretion, excuse a defendant's procedural default under either one of two instances: "(1) when 'a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error,' or (2) when 'a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Sebby*, 2017 IL 119445, ¶ 48, 89 N.E.3d 675 (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565, 870 N.E.2d 403, 411 (2007)). As the first step in the plain-error analysis, we must determine "whether there was a clear or obvious error at trial." *Sebby*, 2017 IL 119445, ¶ 49. The burden of persuasion rests with the defendant. *People v. McLaurin*, 235 Ill. 2d 478, 495, 922 N.E.2d 344, 355 (2009).

¶ 29         A " 'Photo lineup' means a procedure in which photographs are displayed to an eyewitness for the purpose of determining if the eyewitness is able to identify the perpetrator of a crime." 725 ILCS 5/107A-0.1 (West 2018). Section 107A-2 of the Code of Criminal Procedure of 1963 (Criminal Code) (725 ILCS 5/107A-2 (West 2018)) governs how law enforcement may conduct lineups, providing two specific methods: (1) "[a]n automated computer program or other

device that can automatically display a photo lineup to an eyewitness in a manner that prevents the lineup administrator from seeing which photograph or photographs the eyewitness is viewing until after the lineup is completed" and (2) "[a] procedure in which photographs are placed in folders, randomly numbered, and shuffled and then presented to an eyewitness such that the lineup administrator cannot see or know which photograph or photographs are being presented to the eyewitness until after the procedure is completed." 725 ILCS 5/107A-2(2)(3) (West 2018). The statute further provides: "The photographs, recordings, and the official report of the lineup required by this Section shall be disclosed to counsel for the accused as provided by the Illinois Supreme Court Rules regarding discovery." 725 ILCS 5/107A-2(i) (West 2018).

¶ 30       Other than referencing this statutory lineup procedure, defendant cites no legal authority supporting his argument that Bausily's viewing of defendant's picture as part of pretrial preparation constitutes a "lineup" within the meaning of the statute. The fact that this procedure is contained in Title II of the Criminal Code (apprehension and investigation) is at least persuasive of its intended purpose as part of the arrest and investigation process. Defendant argues it applies to any postarrest or pretrial display of a defendant's photo to a witness by a prosecutor in preparation for trial but provides no authority for such a broad application. The purpose of the statute is clear—it is intended for investigative identification procedures used by law enforcement to learn the identity of suspects. Here, defendant had long since been identified as the suspect, charged, and was proceeding to trial. The witness had already indicated she was familiar with defendant and had seen him on social media for the past 10 years. Further, as Bausily testified, she was making her identification of defendant in the courtroom based on her observation of the person she saw outside Woodward's truck in the parking lot.

¶ 31    Additionally, Illinois Pattern Jury Instruction 3.10 states it is proper for an attorney to interview or attempt to interview a witness for the purpose of learning the testimony the witness will provide. Illinois Pattern Jury Instructions, Criminal, No. 3.10 (approved October 17, 2014). Further, neither the display of the photograph to Bausily during pretrial preparation nor Bausily's statements to the prosecutor upon viewing it constitute a *Brady* violation. The Supreme Court in *Brady* held that "the suppression by the prosecution of evidence *favorable* to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." (Emphasis added.) *Brady*, 373 U.S. at 87. The lead prosecutor was only required to disclose evidence favorable to defendant, and there is nothing favorable to the defense in the display of the picture and Bausily's pretrial conversation with the prosecutor concerning it. There is nothing in our supreme court rules that we are aware of, or that defendant cites requiring such a disclosure. Illinois Supreme Court Rule 412 governs the State's required disclosures to the defense as part of discovery. Ill. S. Ct. R. 412 (eff. July 1, 1982). Defendant directs us to no provision therein which requires the State to disclose any portion of pretrial witness preparation, including exhibiting photos of the defendant.

¶ 32    Hence, there was nothing erroneous or improper with the prosecutor's actions. Although Bausily could not identify defendant from a photo array lineup approximately 10 years ago, it was proper, reasonable, and even expected an attorney would question his or her eyewitness on what the witness's testimony would be in preparation for trial, especially when considering the significant passage of time. This was not a statutory "photo lineup" but instead was part of the State's pretrial preparation, and the State was under no obligation to inform the defense they had Bausily view a photo of defendant in preparation for trial.

¶ 33        Notably, defendant does not challenge the sufficiency of Bausily's in-court identification, contending instead that, had he known about the display of defendant's photograph to her before trial, he might have attacked it. Defense counsel had the same opportunity to interview Bausily before trial as did the State to learn her testimony. None of the avenues they now say could have been pursued were foreclosed to them somehow by Bausily's testimony, and she emphatically stated she was identifying defendant based on her observation of him when standing outside Woodward's truck on the day of her disappearance. Any inconsistency between Bausily's 2010 lack of identification and her subsequent in-court identification of defendant are credibility issues going to the weight of her testimony, not the admissibility of her statements. The same is true for any argument counsel sought to make regarding the prosecutor's pretrial preparation. The jury was free to weigh the impact of showing the witness defendant's photo a month before trial. These are matters to be determined by the trier of fact. See *People v. Petermon*, 2014 IL App (1st) 113536, ¶ 30, 19 N.E.3d 115 ("The credibility of identification witnesses and the weight accorded their testimony lie within the province of the trier of fact." (citing *People v. Curtis*, 262 Ill. App. 3d 876, 881, 635 N.E.2d 860, 864 (1994))); see also *People v. Lewis*, 165 Ill. 2d 305, 357, 651 N.E.2d 72, 96 (1995) (holding discrepancies in eyewitness identification testimony affect the weight to be given to such testimony). Independently based in-court identification not unduly influenced by photographs or other extraneous sources is not error. See *People v. Lloyd*, 93 Ill. App. 3d 1018, 1024, 418 N.E.2d 131, 135 (1981); *People v. Freeman*, 60 Ill. App. 3d 794, 802, 377 N.E.2d 107, 113 (1978).

¶ 34        Bausily's in-court identification of defendant was based on her memory of seeing him in the parking lot the day Bonnie disappeared and for the 10 years following. This was further reinforced on cross-examination:

"Q. And the man you saw, uh, you were fairly close to him when you saw him, correct?

A. Very close

Q. In fact, you just testified that he looked at you, correct?

A. Yes.

Q. And you looked at him, correct?

A. Yes.

Q. So, you got a very good look at his face, correct.

A. I did.

Q. And, uh [a]bout 10 feet away from him when you saw him?

A. Probably so. If it was even 10."

¶ 35        In spite of continued questioning about seeing the photo a month before trial, Bausily maintained her identification was based on the man she saw in 2010: "I know the man I saw and I have pointed him out." She continued to assert, "I know who I saw and I know for a fact that that's him sittin[g] at the end of the table there." This was an issue for the trier of fact, weighing all the circumstances surrounding the identification as well as the credibility of the witness. *Petermon*, 2014 IL App (1st) 113536, ¶ 30. Defense counsel had every opportunity to, and did, cross-examine Bausily on her inability to identify defendant in the line-up 10 years previously, compared to her ability to identify him in court. Bausily also pointed out she had seen pictures of defendant for the past 10 years on social media, so any likelihood of shaking her

identification of him was slim. This would be true whether the State had shown her a photo or not.

¶ 36    Ultimately, the burden of persuasion for a plain-error analysis rests with defendant. *McLaurin*, 235 Ill. 2d at 495. We do not find the prosecutor's display of a photograph to witness Bausily fell within the requirements of the statutory lineup procedure defendant argues without supporting authority. Further, we find it to be a part of pretrial preparation by the State, also not requiring disclosure under Rule 412 or otherwise falling within the definition of *Brady* material mandating disclosure to the defense. Having found no error, there is no need to consider plain error further. See *People v. Hillier*, 237 Ill. 2d 539, 545, 931 N.E.2d 1184, 1187 (2010).

¶ 37                    B. Nathan Carroll's Written Notes

¶ 38    Defendant claims the trial court erred when it concluded Nathan's notes fell under the protection of attorney-client privilege. Although defendant cites general propositions of law regarding attorney-client privilege, he fails to cite any specific authority to support his claim the court erred in concluding it applied here.

¶ 39    It is axiomatic that communications between the client and the client's attorney are privileged. *Fischel & Kahn, Ltd. v. Van Straaten Gallery, Inc.*, 189 Ill. 2d 579, 727 N.E.2d 240 (2000). The purpose of the attorney-client privilege is to encourage and promote full communication between the client and attorney without fear the confidential information will be disseminated to others. *People v. Simms*, 192 Ill. 2d 348, 381, 736 N.E.2d 1092, 1117 (2000). "Where legal advice of any kind is sought from a lawyer in his or her capacity as a lawyer, the communications relating to that purpose, made in confidence by the client, are protected from disclosure by the client or lawyer, unless the protection is waived." *Center Partners, Ltd. v.*

*Growth Head GP, LLC*., 2012 IL 113107, ¶ 30, 981 N.E.2d 345. The attorney-client privilege protects communications that the client either expressly made confidential or that he could reasonably believe, under the circumstances, would be understood by the attorney as such. *Garvy v. Seyfarth Shaw LLP*, 2012 IL App (1st) 110115, ¶ 30, 966 N.E.2d 523. Whether the attorney-client privilege applies to a communication requires an examination of the circumstances surrounding the communication. *People v. Knippenberg*, 66 Ill. 2d 276, 282-83, 362 N.E.2d 681, 683 (1977). The party seeking disclosure from an attorney has the burden of establishing that the attorney-client privilege does not apply. *DeHart v. DeHart*, 2012 IL App (3d) 090773, ¶ 50, 978 N.E.2d 12. When deciding the applicability of the attorney-client privilege, a reviewing court applies a *de novo* standard of review. *Hayes v. Burlington Northern & Santa Fe Ry. Co*., 323 Ill. App. 3d 474, 477, 752 N.E.2d 470, 473 (2001).

¶ 40        After receiving a subpoena to appear and produce Nathan Carroll's notes, his attorney provided them to the trial court. Nathan's attorney described two types of notes: those connected with Nathan's grand jury testimony, the nature of answers he had given, and discussions with counsel about his testimony; and notes contained in a notebook related directly to conversations between Nathan and his attorney also regarding his representation. Defense counsel admitted that it was "probably attorney client [privilege]" but still requested the notes based on defendant's right to confront the witness.

¶ 41        Nathan's attorney described the notes as communications between Nathan and counsel regarding the facts and circumstances surrounding the murder, discussed in confidence with his attorney. He also described them as having been written either contemporaneously or shortly after meeting with his attorney. Counsel also clarified the notes were from various one-on-one meetings Nathan had with his attorney, not the prosecutor, and denied, upon direct

inquiry by the court, the existence of any other notes relating to meetings with the prosecutor. Once we evaluate the circumstances under which the writings were made (see *Knippenberg*, 66 Ill. 2d at 282-83), as described by Nathan's attorney, it becomes evident they were based on conversations with his attorney alone, in confidence, and not intended for dissemination to anyone. It is reasonable to conclude Nathan believed the notes were to remain confidential under the attorney-client privilege. *Garvy*, 2012 IL App (1st) 110115, ¶ 30. Further, unless otherwise apparent from the record, we are to give the trial court the benefit of the doubt that the court is cognizant of the law and knows how to apply it. *People v. Howery*, 178 Ill. 2d 1, 32, 687 N.E.2d 836, 851 (1997). Here, after the court's *in camera* review, the court also concluded the material was privileged and not subject to disclosure. Lastly, defense counsel essentially conceded the material was covered by the privilege. The record clearly supports such a conclusion, and we find no reason to find otherwise.

¶ 42       Nathan's attorney confirmed that Nathan was not waiving his attorney-client privilege. Absent waiver, defendant was not entitled to the privileged communications between Nathan and his attorney. *Center Partners, Ltd*., 2012 IL 113107, ¶ 30. It is the defendant's burden to establish that the attorney-client privilege does not apply (*DeHart*, 2012 IL App (3d) 090773, ¶ 50), and we find defendant has failed to do so.

¶ 43                    C. Other-Crimes Evidence

¶ 44       Defendant claims the trial court abused its discretion by allowing Monica to testify, as other-crimes evidence, about the domestic battery incident in March 2018, which ultimately led to renewed interest in defendant as a suspect in the disappearance of Woodward 10 years earlier. We disagree.

¶ 45　　　　In February 2020, the State filed a motion *in limine* requesting to introduce the domestic battery as other-crimes evidence, claiming it was part of a continuing narrative of events showing defendant's consciousness of guilt. The next day, defense counsel filed their own motion *in limine* contending this evidence was not admissible due to spousal privilege or as character evidence under Illinois Rule of Evidence 404 (eff. Jan. 1, 2011). The trial court denied defendant's motion *in limine*, thereby also implicitly granting the State's motion, finding the probative value outweighed the risk of unfair prejudice.

¶ 46　　　　Other-crimes evidence encompasses misconduct or criminal acts that occurred either before or after the alleged criminal conduct for which the defendant is standing trial. *People v. Illgen*, 145 Ill. 2d 353, 365, 583 N.E.2d 515, 520 (1991). Normally, other-crimes evidence is inadmissible if the evidence is relevant only to demonstrate defendant's propensity to engage in criminal activity. *People v. Richee*, 355 Ill. App. 3d 43, 50-51, 823 N.E.2d 142, 149 (2005). It may be admissible, however, if it is part of a continuing narrative of the event that gave rise to the offense (*People v. Thompson*, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005)), or to explain an aspect of the crime charged that otherwise would be implausible or inexplicable. *People v. Carter*, 362 Ill. App. 3d 1180, 1190, 841 N.E.2d 1052, 1060 (2005).

¶ 47　　　　Evidence may be admissible to prove a material fact relevant to the case other than propensity. *People v. Donoho*, 204 Ill. 2d 159, 170, 788 N.E.2d 707, 714 (2003). Even if relevant, a trial court may still exclude the evidence if the prejudicial effect substantially outweighs the probative value. *Illgen*, 145 Ill. 2d at 365. We will review the trial court's decision under an abuse of discretion standard. *Donoho*, 204 Ill. 2d at 182. "An abuse of discretion has occurred when the trial court's decision is arbitrary, fanciful, or unreasonable or when no

reasonable person would take the position adopted by the trial court." *People v. Wilson*, 2015 IL App (4th) 130512, ¶ 75, 44 N.E.3d 632.

¶ 48　　　　We find the trial court did not abuse its discretion because the other-crimes evidence presented here was admissible as part of a continuing narrative. At the hearing on the dueling motions, the State indicated it had no intention of turning Monica's testimony into a "mini trial." Rather, it argued the domestic incident was probative not only because of defendant's statements but to explain how the incident led to the reopening of the Bonnie Woodward investigation approximately eight years later and as part of a continuing narrative of defendant's actions and behavior after the murder. The State also argued the incident explained Nathan's motivation for coming forward to tell the truth about the Woodward murder eight years later—conduct which might otherwise have been inexplicable without some context. *Carter*, 362 Ill. App. 3d at 1190. In addition to defendant's claim its admission would result in a "mini trial," he also argued it should be excluded under Illinois Rule of Evidence 403 (eff. Jan. 1, 2011), which provides for the exclusion of otherwise relevant evidence if the probative value is substantially outweighed by the risk of unfair prejudice. The trial court, after a proper inquiry, balanced the probative value against any undue prejudice. The State limited its evidence to the purpose of the continuing narrative exception, and we find the trial court's decision to allow it was not arbitrary, fanciful, or unreasonable. *Wilson*, 2015 IL App (4th) 130512, ¶ 75.

¶ 49　　　　Here, the trial court was in the best position to determine whether other-crimes evidence was admissible and weigh the prejudicial impact of this evidence in the context of the entire case before deciding to admit it. We conclude the court did not abuse its discretion when doing so. *Donoho*, 204 Ill. 2d at 182.

¶ 50　　　　　　　　　　　D. Monica's Cross-Examination

¶ 51 Defendant contends the trial court erred by limiting Monica's cross-examination about her financial interest and bias in testifying against defendant. The State claims defendant waived the issue. We agree with the State.

¶ 52 Although defendant raised this issue in his posttrial motion, he failed to object to limiting Monica's cross-examination during the course of the proceedings. In order to preserve the issue for appeal, he is required to do *both*. *Woods*, 214 Ill. 2d at 470. Defendant cannot pursue one course of action before the trial court and then claim error for having done so once he appeals. "It is well settled that a party cannot acquiesce to the manner in which the trial court proceeds and later claim on appeal that the trial court's actions constituted error." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 60, 129 N.E.3d 755; see also *People v. Hughes*, 2015 IL 117242, ¶ 33, 69 N.E.3d 791 ("[A] party cannot complain of error that it brought about or participated in."). "Active participation in the direction of proceedings *** goes beyond mere waiver." *People v. Villarreal*, 198 Ill. 2d 209, 227, 761 N.E.2d 1175, 1184 (2001).

¶ 53 During cross-examination, to show a financial interest, bias, and a possible motive for wanting defendant convicted of this offense, defendant's counsel confirmed the pendency of Monica's divorce case and asked whether the marital assets at stake were worth "about $800,000." The trial court heard counsel's justification for the question and the State's relevance objection and proposed asking the question outside the jury's presence since, it reasoned, if she did not believe a conviction would impact the asset distribution in the divorce, there was no reason for the question other than to raise an improper inference. See *People v. Crane*, 2020 IL App (3d) 170386, ¶ 29 (stating that reasonable inferences based on the evidence are permissible, unreasonable or speculative inferences are not). As the court noted, since the comment about marital assets of "about $800,000" was already before the jury, if she did not believe a conviction improved her

position in the divorce, then counsel would not be permitted to inquire further. Defense counsel acquiesced to this procedure. The jury was removed, and Monica denied believing a conviction would improve her position. The trial court told counsel he was limited to that question and answer in the presence of the jury, and defense counsel again agreed.

¶ 54　　　　Here, defendant's acquiescence waived any claim of error in the trial court's refusal to allow further cross-examination on that issue. *Hibbler*, 2019 IL App (4th) 160897, ¶ 60. Defense counsel voiced no objection to the trial court's suggested procedure, twice agreed with the proposed course of action, and proceeded with a different line of questioning after Monica's answer. Counsel's direct participation in the decision results in estoppel from any claim of error, and we decline to consider this issue on appeal. *People v. Harvey*, 211 Ill. 2d 368, 385, 813 N.E.2d 181, 192 (2004).

¶ 55　　　　　　　　E. Nathan's Testimony About His Family Relationships

¶ 56　　　　Defendant contends it was error for the trial court to permit the prosecutor to elicit testimony from Nathan about the negative reactions he received from other family members after he testified before the grand jury. We disagree.

¶ 57　　　　Over defendant's objection, Nathan testified his paternal grandparents would no longer speak to him after he testified before the grand jury and implicated defendant in the disappearance of Woodward. He also had been threatened by other members of defendant's family. Defense counsel objected, contending this information was neither material nor relevant. The trial court found it went to the credibility of the witness.

¶ 58　　　　"It is well established that trial courts possess discretion in determining the admissibility of evidence, and a reviewing court may overturn a trial court's decision only when the record clearly demonstrates the court abused its discretion." *People v. Harris*, 231 Ill. 2d 582,

588, 901 N.E.2d 367, 370 (2008). "An abuse of discretion occurs where no reasonable person would agree with the position adopted by the trial court." *People v. Farris*, 2012 IL App (3d) 100199, ¶ 26, 968 N.E.2d 191.

¶ 59　　　　It was reasonable for the trial court to conclude this testimony was relevant to the issue of the witness's credibility because it helped explain his reluctance to come forward because of the anticipated reaction he might expect from other family members for having done so. *People v. Tenney*, 205 Ill. 2d 411, 428, 793 N.E.2d 571, 582 (2002). Because the trial court's basis for admitting this testimony appears reasonable under the circumstances, we cannot find the trial court's decision amounted to an abuse of discretion. *Harris*, 231 Ill. 2d at 588.

¶ 60　　　　　　　　　F. The Killing of Dogs on Defendant's Property

¶ 61　　　　Defense counsel next argues the trial court erred by failing to strike bad character evidence in the form of Nathan's testimony about defendant killing dogs on the property. The State says this issue is forfeited. We agree with the State.

¶ 62　　　　"To preserve a claim of error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion." *People v. Staake*, 2017 IL 121755, ¶ 30, 102 N.E.3d 217. Failure to do either results in forfeiture of the issue. *Staake*, 2017 IL 121755, ¶ 30. "[A]n objection to evidence is untimely if not asserted as soon as its ground become apparent." *People v. Koch*, 248 Ill. App. 3d 584, 593, 618 N.E.2d 647, 653 (1993). If an objection does not arise until after the admission of evidence, the appropriate action is to make a motion to strike. *Koch*, 248 Ill. App. 3d at 593. The motion to strike must be made as soon as possible "or the would-be movant will be deemed to have waived any complaint with regard to that evidence." *Koch*, 248 Ill. App. 3d at 593.

¶ 63    During the relevant portion of Nathan's direct examination, the State's inquiry went as follows:

"Q. Did your dad ever kill anything else on that property?

A. Yes.

Q. What?

A. Dogs.

Q. How many?

A. I can recall two on the property.

Q. Were they your dogs?

A. One of 'em.

Q. You know why he killed your dog?

[DEFENSE COUNSEL]: Object. May I approach, Your

Honor?"

¶ 64    After the sidebar, defense counsel's objection was sustained; however, counsel never sought to have either the question or response stricken. Here, defendant contends the trial court erred by not striking the offending testimony *sua sponte*.

¶ 65    Because counsel failed to object when the topic of killing dogs was first broached by the State and then did not seek to have the allegedly improper testimony stricken, defendant will be found to have forfeited this argument before us. See *Staake*, 2017 IL 121755, ¶ 30; *People v. Outlaw*, 388 Ill. App. 3d 1072, 1088, 904 N.E.2d 1208, 1223 (2009).

¶ 66                    G. Ineffective Assistance of Counsel

¶ 67    Finally, defendant combines all the preceding claims of error, plus a few more, to argue he was denied the effective assistance of counsel at trial.

¶ 68        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). "Deficient performance" means "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). "Prejudice" in the context of an ineffective assistance of counsel claim requires a showing of a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). "Satisfying the prejudice prong necessitates a showing of actual prejudice, not simply speculation that defendant may have been prejudiced." *People v. Patterson*, 2014 IL 115102, ¶ 81, 25 N.E.3d 526.

¶ 69        " 'A reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *People v. Peeples*, 205 Ill. 2d 480, 513, 793 N.E.2d 641, 662 (2002) (quoting *Strickland*, 466 U.S. at 694).

¶ 70        A defendant must satisfy both prongs of *Strickland*, and the failure to satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010). "We review a defendant's claim of ineffective assistance of counsel in a bifurcated fashion, deferring to the trial court's findings of fact unless they are contrary to the manifest weight of the evidence, but assessing *de novo* the ultimate legal question of whether counsel was ineffective." *People v. Manoharan*, 394 Ill. App. 3d 762, 769, 916 N.E.2d 134, 141 (2009).

¶ 71    1. *Defense Counsel's Stipulation to Bone Fragment Evidence*

¶ 72    Reviewing courts are to make every effort to evaluate counsel's performance from his perspective at the time, rather than in hindsight. See *People v. Madej*, 177 Ill. 2d 116, 157, 685 N.E.2d 908, 928 (1997). Defendant must overcome a strong presumption that defense counsel's conduct "falls within the wide range of reasonable professional assistance and that the challenged conduct constitutes sound trial strategy." *People v. Smith*, 326 Ill. App. 3d 831, 841, 761 N.E.2d 306, 316 (2001) (citing *Strickland*, 466 U.S. at 689). "The mere use of stipulations does not establish ineffective assistance of counsel." *Smith*, 326 Ill. App. 3d at 851 (citing *People v. Coleman*, 301 Ill. App. 3d 37, 46, 704 N.E.2d 690, 697 (1998)). In order to successfully claim trial counsel was ineffective by agreeing to a stipulation, defendant must satisfy *Strickland*'s prejudice prong and overcome the strong presumption it was part of counsel's trial strategy. *Coleman*, 301 Ill. App. 3d at 47.

¶ 73    The report authored by Dr. Angie Christenson of the FBI analyzed the bone fragments found in the area of the burn pile on defendant's property. The stipulated report included her findings that human origin could not be excluded from the bone fragments and some of the fragments were "thermally altered." Barring any likelihood defendant had a competing expert available to refute the findings of the FBI forensic scientist, the fact he may have chosen to minimize the import of bone fragment evidence by stipulating to the ultimate findings is not an unreasonable trial strategy. Defense counsel had two options: allow a seasoned FBI scientist to walk the jury through each excruciatingly macabre detail about the bone fragments and their exposure to heat and charring, thereby keeping the thought of a burning human being in the forefront of their minds for as long as the testimony takes, or read an emotionless stipulation stating sterile facts to the jury in a perfunctory fashion, thereby hoping to

minimize the impact. See *People v. Penrod*, 316 Ill. App. 3d 713, 725, 737 N.E.2d 341, 352 (2000). It is also conceivable defense counsel did not want Dr. Christensen highlighting the fact there were dozens of untested bone fragments found on defendant's property, which could not be excluded as coming from Woodward. The stipulation to such evidence was a reasonable trial strategy, defendant's claim of prejudice is speculative at best, and he fails to overcome the "reasonable trial strategy" presumption. *Coleman*, 301 Ill. App. 3d at 47.

¶ 74                              2. *Failure to Strike Bausily's In-Court Identification*

¶ 75          Defendant claims "[d]efense counsel failed to invoke any of 725 ILCS 5/107A-2 breached safeguards or mandated disclosures." As previously discussed, the showing of the photo by the prosecutor as part of pretrial preparation did not fall under the investigatory lineup statute under section 107A-2. There was therefore no error by trial counsel in failing to raise it as an issue. Thus, we will not find trial counsel ineffective for failing to assert it. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14, 123 N.E.3d 1285 (stating defense counsel will not be found ineffective for failing to assert a meritless objection); see also *People v. Williams*, 147 Ill. 2d 173, 238-39, 588 N.E.2d 983, 1009 (1991) ("[D]efense counsel is not required to undertake fruitless efforts to demonstrate his effectiveness."); *People v. Anderson*, 2013 IL App (2d) 111183, ¶ 65, 992 N.E.2d 539 (concluding counsel was not ineffective for failing to raise a meritless motion).

¶ 76          Defendant contends trial counsel was ineffective for failing to prevent Bausily from what he characterizes as "improperly enhancing the credibility of her eyewitness identification testimony." Defendant cites no legal authority in support of his argument. Under Illinois Supreme Court Rule 341(h)(7) (eff. May 25, 2018), each argument is to be supported by citation to relevant authority. "Both argument and citation to relevant authority are required."

*Vancura v. Katris*, 238 Ill. 2d 352, 370, 939 N.E.2d 328, 340 (2010). "A reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719, 495 N.E.2d 1132, 1137 (1986). " 'The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument.' " *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 43, 123 N.E.3d 1271. However, where the appellate court finds the flaws were not "so serious as to interfere with [the appellate court's] ability to understand and adjudicate [the] case," the court may address the issue presented. *State Farm Mutual Automobile Insurance Co. v. Burke*, 2016 IL App (2d) 150462, ¶ 22, 51 N.E.3d 1082.

¶ 77        On direct examination, Bausily acknowledged being unable to pick defendant out from the photo lineup she was shown 10 years before. After defense counsel asked Bausily about seeing defendant's picture a month before trial, counsel showed her a copy of what he represented to be the photo lineup she had seen previously. Although she disputed it was the same photo array, she acknowledged the defendant seated at the defense table was photo "number four" on the photo lineup. On redirect examination, the State asked what she said when she saw his picture a month before trial, and she responded:

> "I told you that that was definitely the man that I would never
>
> forget his face and his eyes kinda told it all. The photo lineup
>
> doesn't look like the one I saw 10 years ago when it happened[,]
>
> but I know who I saw and I know for a fact that that's him sittin' at
>
> the end of the table there."

¶ 78 Here, the State was simply asking a follow-up question based on defendant's cross-examination, which it is allowed to do. See *People v. Tingle*, 279 Ill. App. 3d 706, 716, 665 N.E.2d 383, 391 (1996) (stating the purpose of redirect examination is to explain new matters brought out on cross-examination). On redirect examination, the prosecutor was establishing that Bausily informed him, well before trial, that her ability to identify defendant was based on the person she saw that day. Further, she explained why she was unable to identify him from the photo lineup at the time. This was legitimate redirect examination based on defendant's cross-examination. Counsel may well have chosen not to object in order to avoid highlighting the testimony even further or inviting further explanation, which might only reinforce Bausily's in-court identification. See *People v. Owens*, 372 Ill. App. 3d 616, 625, 874 N.E.2d 116, 122 (2007) (opining that defense counsel may have opted not to object to avoid highlighting the testimony). Because there was no error in Bausily's redirect examination testimony, we do not find defense counsel ineffective for failing to assert a meritless objection. *Bradford*, 2019 IL App (4th) 170148, ¶ 14.

¶ 79                                  3. *Monica Carroll's Cross-Examination*

¶ 80 Defendant claims counsel was ineffective for failing to question Monica about a civil suit in which she was seeking "substantial compensatory and punitive damages." We are unable to locate any mention of a pending civil suit against defendant. " 'The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument.' " *Hoke*, 2019 IL App (4th) 150544-B, ¶ 43. Therefore, due to defendant's failure to properly cite to the record or to any relevant legal authority on this issue, we find it is forfeited and will not be considered.

¶ 81                                  4. *The Killing of Dogs on the Property*

¶ 82        Defendant states defense counsel was ineffective for failing to object to Nathan's testimony about defendant killing dogs on his property. A failure to object to certain trial testimony may be a matter of trial strategy and does not necessarily establish substandard performance. *People v. Graham*, 206 Ill. 2d 465, 478-79, 795 N.E.2d 231, 239-40 (2003). Defendant must overcome the strong presumption this fell within defense counsel's trial strategy. *Smith*, 326 Ill. App. 3d at 841. Even if there is error, defendant is still tasked with the responsibility to show how he was so substantially prejudiced by the testimony that the outcome of the trial is reasonably likely to have been different. *Evans*, 209 Ill. 2d at 219-20 (citing *Strickland*, 466 U.S. at 694).

¶ 83        As previously stated, some of the physical evidence consisted of bone fragments from the location of a burn pit on defendant's property. Several other bones were recovered from various "quadrants" on the property. Although some of the bones could not be excluded to be of human origin, others, for various reasons, were never tested. It is not an unreasonable trial strategy to allow the testimony about dogs being killed on the property to stand in order to allow the jury to surmise some of the bones found could have been those of dogs or other wildlife one might assume to have accumulated over time on defendant's wooded country property. Moreover, as noted by the State, there was nothing in the testimony to suggest the dogs were killed maliciously. Any juror familiar with life in the country may have been able to relate to those unfortunate circumstances where a family pet had to be put down for one reason or another. Defendant fails to establish how trial counsel's failure to object was objectively unreasonable. *Valdez*, 2016 IL 119860, ¶ 14. As a result, defendant has failed to carry his burden on this issue. *Clendenin*, 238 Ill. 2d at 317-18.

¶ 84                        5. *Nathan's Notes*

¶ 85        Defendant claims, "Defense counsel failed to provide argument essential to obtaining key evidence highly favorable to the defendant." Defendant sums up his entire argument in one brief paragraph:

> "Nathan Carroll's written notes were likely evidence favorable to the defense harboring inconsistencies between what they recorded and his trial testimony. Counsel allowed the trial court to apply non-precedential foreign guidance without advancing existing Illinois opinions that warranted a disclosure of their contents even if an attorney-client privilege exi[s]ted. Moreover, they failed to point out that inconsistencies were substantive evidence under Illinois law rendering the foreign guidance relied upon completely inapplicable."

¶ 86        Aside from ignoring the fact that, once defense counsel objected and made his record, the trial court, and not defense counsel, determined what would transpire, defendant seems to be arguing that since defense counsel "allowed" this to happen, he was somehow deficient. We would note, however, defense counsel objected to the application of any attorney-client privilege and maintained throughout that he was entitled to the notes. Defendant's objection and subpoenaing of the notes prompted an evidentiary hearing on the matter, where they again maintained their right to review the records for use in conducting an adequate cross-examination of the most damaging State's witness. Again, defendant is required to cite to the record and to relevant authority to support his claims on appeal. Mere contentions without proper citation to authority do not merit our consideration on appeal. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12, 969 N.E.2d 930. His failure to do so results in

forfeiture of this issue on appeal. *Hoke*, 2019 IL App (4th) 150544-B, ¶ 43.

¶ 87                                6. *Defendant's Taped Interrogation*

¶ 88        Finally, defendant contends defense counsel was ineffective for failing to redact what he considers "damaging passages" on the taped interview with Detective Golike.

¶ 89        Defendant cites to two passages he claims should have been redacted. In the first, defendant states, "I was instructed by the attorneys not to say anything and maybe that's why (inaudible). Just shut my yap and just, you know, not say anything." The second occurs at the very end of the interview when defendant states, "So, when do I get to talk to my attorney?"

¶ 90        Both statements are admissible. We have previously held these types of statements are not hearsay because they are not offered for the truth of the matter asserted but are helpful in providing context during a police interrogation to explain defendant's answers in light of questions being asked. See *People v. Whitfield*, 2018 IL App (4th) 150948, ¶ 49, 103 N.E.3d 1096 (stating that without providing proper context of the interrogation, "the meaning and significance of defendant's answers, comments, behaviors—or even, at times, his silence— would be difficult to discern"). Again, defense counsel cannot be found ineffective for failing to pursue a meritless motion to redact admissible evidence. *Anderson*, 2013 IL App (2d) 111183, ¶ 65.

¶ 91        There is nothing about defense counsel's performance that we find deficient. Defendant is required to satisfy both prongs of *Strickland*, and the failure to satisfy either precludes a finding of ineffective assistance. *Clendenin*, 238 Ill. 2d at 317-18. We therefore need not address the prejudice prong at all.

¶ 92                                III. CONCLUSION

¶ 93        For the reasons stated, we affirm defendant's conviction.

¶ 94          Affirmed.