**2026 IL 131360**

# IN THE

# SUPREME COURT

# OF

# THE STATE OF ILLINOIS

————————

(Docket No. 131360)

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROGER W. CARROLL JR., Appellant.

*Opinion filed May 21, 2026.*

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.

Chief Justice Neville and Justices Overstreet, Holder White, Rochford, and O'Brien concurred in the judgment and opinion.

Justice Tailor took no part in the decision.

## OPINION

¶ 1 Following a jury trial in the circuit court of Jersey County, the defendant, Roger W. Carroll Jr., was convicted of the first degree murder of Bonnie Woodward and sentenced to a 65-year term of imprisonment. Carroll's murder conviction was affirmed on direct appeal to the appellate court. *People v. Carroll*, 2021 IL App (4th) 200491-U.

¶ 2      Carroll subsequently filed a postconviction petition that raised several claims of ineffective assistance of trial counsel. The petition was dismissed by the circuit court at the second stage of the postconviction proceedings. On appeal, the appellate court affirmed the judgment of the circuit court, holding, in part, that the circuit court properly dismissed the petition because all of Carroll's claims of ineffective assistance of trial counsel could have been raised on direct appeal and, thus, were forfeited. 2024 IL App (4th) 231207. For the following reasons, we hold that the appellate court erred in finding that Carroll's claims of ineffective assistance of trial counsel were forfeited, but the claims nevertheless fail on their merits. Accordingly, we affirm the judgment of the appellate court affirming the dismissal of Carroll's petition.

¶ 3                            BACKGROUND

¶ 4      On June 25, 2010, Bonnie Woodward, a 47-year-old nursing home employee, disappeared from her workplace in Alton, Illinois. Eight years later, in April 2018, Carroll was charged with her murder. The case proceeded to a jury trial in March 2020.

¶ 5      At trial, Alton police detective Scott Golike testified that in 2010 he was chief of detectives with the Alton Police Department and that he oversaw the investigation into Woodward's disappearance. Golike testified about the various circumstances that led authorities to identify Carroll as a suspect in the disappearance. Golike explained that Woodward's boyfriend reported her missing on June 26, 2010. Police then went to the nursing home in Alton where Woodward worked and discovered her pickup truck in the employee parking lot with its doors locked and windows down. Several of Woodward's coworkers told police that after Woodward left work around 3 p.m. in the afternoon of June 25, 2010, she was seen talking to an unknown White male in his forties near her truck. The coworkers also stated that they had seen an unfamiliar four-door, gray Chevrolet Malibu in the parking lot.

¶ 6      During his investigation into Woodward's disappearance, Golike learned that Woodward's 17-year-old stepdaughter, Heather Woodward, was also missing and had not been seen for several days. On July 3, 2010, Heather appeared alone at the East Alton public library. She subsequently told police that she had been staying

with Carroll, his wife, Monica Carroll, and their 16-year-old son, Nathan Carroll, in their rural home in Jerseyville, Illinois, just north of Alton.

¶ 7        Golike testified that, on July 5, 2010, he spoke with Carroll at his home. Carroll was cooperative, spoke to Golike voluntarily, and consented to a search of his property. Carroll also allowed his car—a four-door, gray Chevrolet Malibu—to be towed to the Alton Police Department to be searched.

¶ 8        Fingerprints were eventually recovered from the exterior driver's door of Woodward's truck, and analysts were able to match a fingerprint and palm print to Carroll. Thereafter, on September 29 and 30, 2010, a search warrant was executed on Carroll's home and 60-acre property. Multiple firearms were seized from Carroll's home at that time, including a Stoeger Cougar 9-millimeter handgun. However, no evidence was found on the property, or in Carroll's car, that linked Carroll to Woodward's disappearance.

¶ 9        Golike testified that, while Carroll's property was being searched on September 29, 2010, he placed Carroll in his squad car, removed him from the scene, and then spoke with him for about three hours. Golike then transported Carroll to the police station to memorialize and record the conversation that occurred in the squad car. The videotaped recording of that interview was admitted into evidence but is not included in the record on appeal. However, the court reporter's transcript of the interview as it was played for the jury is in the record.

¶ 10        During the interview, Carroll explained that, just prior to Woodward's disappearance, he, his family, and Heather had been staying at the home of his wife's parents in Goreville, Illinois, which was located about three hours south of Jerseyville. Carroll also stated that on June 25, 2010, the day of Woodward's disappearance, he and Nathan drove home to Jerseyville early in the morning. Carroll then did yard work before going out to dinner with Nathan.

¶ 11        Carroll told Golike that his family knew Heather through church and that Heather stayed with his family beginning on June 17, 2010. However, Carroll denied knowing Woodward or ever speaking with her. He also denied ever being at Woodward's workplace and stated there was "no way" his fingerprints were on the door of Woodward's truck.

¶ 12    In addition to interviewing Carroll, police officers also showed a photo array that included a photograph of Carroll to Woodward's coworkers at the nursing home. However, none of the coworkers were able to identify the man they saw with Woodward on June 25, 2010. The coworkers were also shown a photograph of Carroll's car, but none of them were able to identify it as the car they saw in the parking lot.

¶ 13    Following the search of Carroll's property and his interview in September 2010, the investigation into Woodward's disappearance remained stalled for nearly eight years. In early 2018, however, a domestic battery incident involving Carroll and his wife, Monica, led law enforcement back to Carroll as a suspect. Monica reported to the police that Carroll had attacked her while in their home, striking her repeatedly in the neck and face with a Taser. After Monica reported the attack, Carroll was discovered in the woods near his home where he had attempted to commit suicide by overdosing on insulin. In subsequent conversations with the police, Monica voiced her suspicions about Carroll's involvement in the disappearance of Woodward. Monica stated that, during his attack on her, Carroll said, "I have killed for you" and "I am a monster."

¶ 14    After Carroll's arrest for the domestic battery, Carroll's son, Nathan, was subpoenaed to testify before a grand jury and was granted immunity from prosecution if he testified truthfully. Following Nathan's grand jury testimony, Carroll was charged with Woodward's murder.

¶ 15    At trial, Nathan testified under immunity about the events surrounding Woodward's disappearance. Nathan, who was 25 years old at the time of trial, stated he was 16 when Woodward disappeared. Nathan explained that, in 2010, he knew Woodward's stepdaughter, Heather, through a church group. On June 10, 2010, Heather ran away from home and then came to stay with Nathan and his parents on June 17, 2010. Nathan stated that he never met Woodward but that Carroll told him she "was a bad person," who was "mean and aggressive and abusive" to Heather. Nathan also stated that Carroll told him Woodward "needed to go away and never come back."

¶ 16    Nathan further testified that, while he, his parents, and Heather were vacationing in late June 2010 in Goreville, Illinois, at his grandparents' house,

Carroll told him that Woodward "needed to die." Nathan said that he tried to talk Carroll out of doing anything.

¶ 17    Nathan stated that he and Carroll returned to their home in Jerseyville, Illinois, in the morning of June 25, 2010, a day earlier than Monica and Heather. Prior to going home that day, Carroll and Nathan drove by Woodward's workplace. According to Nathan, Carroll knew Woodward's work schedule and what type of vehicle she drove because Heather had given him that information. Carroll told Nathan it was good that Woodward was working and pointed out her car. After that, Carroll and Nathan drove by Woodward's house and then returned home.

¶ 18    Nathan testified that, once they arrived home, Carroll showered, shaved, and dressed. He then loaded a handgun, told Nathan, "this has gotta happen whether you like it or not," and drove away in his gray, four-door Malibu. After Carroll left, Nathan, in preparation, erected a tent away from the house with the idea that Carroll would tell Woodward that Heather was staying in the tent to lure Woodward inside.

¶ 19    Nathan stated that, after Carroll returned home, he heard eight or nine gunshots from an area behind the garage. Nathan went outside, and as he rounded the corner of the garage, he saw feet clad in white sneakers and the lower part of human legs wearing tan "scrub pants." Carroll told Nathan "not to go back there because it's ugly." Nathan then saw Carroll start up a tractor, scoop a body up in the front loader, and dump the body in a large brush fire previously lit by Nathan upon Carroll's order. When Carroll came into the house, Nathan saw Woodward's phone in Carroll's hand. Nathan grabbed it, smashed it, and threw it in the fire. Carroll then mowed the grass where the body had been. When Carroll came into the house, he changed his clothes and then threw both his and Nathan's clothes on the fire. The two then went to dinner. According to Nathan, Carroll told him that he had convinced Woodward to get in his car by telling her that he had Heather.

¶ 20    Nathan testified that he and Carroll both continually stoked the fire for several days. After the fire burned out, Carroll scooped up the ashes with the tractor and dumped them in a creek behind the house.

¶ 21    Nathan stated that he initially spoke with the police on July 5, 2010, but Carroll had told him not to say anything about the murder. Nathan further stated that Carroll talked about the murder "[a]lmost nightly for a couple years," constantly telling

Nathan what to say if questioned by the police. Nathan said Carroll told him he had placed his arm on Woodward's truck.

¶ 22    Nathan admitted that he lied when he was first questioned about Woodward's disappearance because he wanted to protect his father. Nathan stated that, in 2018, after being granted immunity and speaking with his attorney, he then told the truth before a grand jury about his and Carroll's involvement in the murder and the disposal of Woodward's remains. Subsequently, on April 4, 2018, Nathan went with police officers to his home to show them where Woodward had been shot, where the burn site had been, and where Woodward's remains were placed in the creek. Nathan also identified the gun Carroll had taken with him on June 25, 2010, as a Stoeger Cougar 9-millimeter handgun.

¶ 23    On cross-examination, Nathan admitted that he had remembered more things about the murder as time had gone by. He stated that he had talked to seven or eight police officers over the years and they had told him more details about the incident. He also acknowledged that he and Carroll frequently shot firearms on their property.

¶ 24    Monica testified that, upon returning to Jerseyville from vacation in June 2010, she saw a huge burn pile, which burned continuously for six or seven days. According to Monica, both Carroll and Nathan repeatedly stoked the fire. When the fire burnt out, she observed both Carroll and Nathan use the bucket tractor to retrieve the ashes from the burn pile and take them toward the creek.

¶ 25    The State presented evidence about the search and excavation of Carroll's property conducted with Nathan's help in April 2018. A 9-millimeter cartridge, shell casing, and projectile were located within the area where Nathan said that Woodward was murdered. A forensic scientist with the Illinois State Police, Aaron Horn, testified that the projectile and shell casing had been fired from the Stoeger Cougar handgun taken from Carroll's residence.

¶ 26    Investigators divided the burn site on Carroll's property into quadrants and found a total of 27 bone fragments across those quadrants. The parties stipulated that all 27 recovered fragments were sent to the Federal Bureau of Investigation for analysis and were determined to be "thermally altered bone fragments." It was also agreed that 10 bones were taken from quadrant one of the search area, 15 from

quadrant two, and 1 each from quadrants three and four. Federal Bureau of Investigation analysis on some of the bones in quadrant one indicated that the bones could not be excluded as being human. No further testing, including DNA analysis, was performed on these bones. Two bones from quadrant two were subject to DNA testing, and neither was a match to Woodward. No DNA testing was performed on the bones from quadrants three and four because there were insufficient quantities of material for testing.

¶ 27        Dr. Alex Wiedenhoeft, a research biologist and wood anatomy research expert from the United States Department of Agriculture Forest Service Product Lab examined three slices taken from a tree located near the burn site on Carroll's property. She testified that the tree experienced a traumatic event during the 2010 growth season.

¶ 28        Amy Hart, a fingerprint expert with the Illinois State Police, testified that she examined 12 fingerprint "lift" cards along with Carroll's fingerprint card, which had been delivered to her by the Alton Police Department. She found 13 impressions that were suitable for comparison. She was able to match one fingerprint and one palm print from the lift cards to Carroll's print card. She testified that she later made an additional eight identifications, six of which belonged to Carroll.

¶ 29        On cross-examination, defense counsel asked numerous questions of Hart aimed at attacking the reliability of her fingerprint analysis and fingerprint analysis in general. Hart admitted she could not tell the age of the prints on the lift cards and did not know where those prints were taken from.

¶ 30        The State called witnesses from Woodward's workplace who testified about seeing her in the employee parking lot on June 25, 2010. April Cathers testified she saw Woodward sitting in her truck with a man standing outside her door with his hands on the driver's side door. Cathers had never seen this man before. Cathers gave a general description of the man, including the fact that he was White, in his forties, and had sandy brown hair. Cathers also observed a gray, four-door car that she believed to be a Chevrolet Malibu in the parking lot. She acknowledged that she was unable to identify anyone from a photo lineup she was shown by the police in July 2010.

¶ 31    Another coworker of Woodward's, Wanda Bausily, testified that as she was leaving work on June 25, 2010, she saw a man standing next to Woodward's truck. She stated that she saw the man's face and that she also saw Woodward and the man walking toward a gray, four-door car. She identified Carroll in court as the man she saw that day.

¶ 32    Bausily admitted that she did not identify Carroll out of a photo lineup she was shown in July 2010. She explained she was unable to do so because, as she recalled, the men's pictures contained more facial hair and the man she saw in the parking lot had no facial hair. However, she insisted she accurately remembered Carroll from when she saw him with Woodward.

¶ 33    As part of the evidence stipulation, the parties stipulated that Woodward's name appeared several hundred times in Carroll's computer after June 25, 2010, but never before that.

¶ 34    After the State rested, the defense called Jarret Ford, an Alton police officer. He had conducted a photo lineup in July 2010, which contained six males, including Carroll. He met with four of Woodward's coworkers, including Bausily. None of them made a positive identification of Carroll. He also showed the coworkers a photo of Carroll's car, and none of them identified it as the car in the parking lot on June 25, 2010. The defense then rested.

¶ 35    The jury found Carroll guilty of first degree murder and also found the statutory enhancement for personally discharging a firearm causing death was proved. Thereafter, the court sentenced Carroll to 40 years in prison, with an additional 25-year enhancement for the use of a firearm. Carroll appealed.

¶ 36    On appeal, Carroll's appellate counsel argued that trial counsel provided ineffective assistance by, among other things, stipulating to the bone fragments' DNA test results, failing to move to strike Bausily's in-court identification of Carroll, and failing to redact damaging passages from his September 29, 2010, recorded interview with police. The appellate court rejected all of Carroll's claims and affirmed his conviction. *Carroll*, 2021 IL App (4th) 200491-U.

¶ 37    On January 5, 2022, in preparation for filing a postconviction petition, Carroll's appellate counsel moved for access to the bone fragments to perform radiocarbon testing to determine the age of the fragments. The motion was granted.

¶ 38    On June 23, 2022, Carroll filed the postconviction petition at issue in this case. The same attorney who represented Carroll in his direct appeal also represented him during the postconviction proceedings. Carroll's postconviction petition alleged seven claims of ineffective assistance of trial counsel based on (1) counsel's failure to move to suppress Carroll's September 29, 2010, interview with Golike, (2) counsel's stipulation to the bone fragment evidence without having the fragments radiocarbon tested for age before trial, (3) counsel's failure to interview Woodward's coworkers who saw a man by Woodward's truck at her workplace, (4) counsel's failure to make the lack of any DNA evidence against Carroll a central theme of the defense, (5) counsel's failure to file a motion for change of venue based on unfavorable pretrial publicity, (6) counsel's failure to use a fingerprint expert who had been retained by counsel to attack the reliability of fingerprint evidence, and (7) counsel's failure to interview a news reporter about a news article stating that the man seen in the parking lot of Woodward's workplace was a smoker.

¶ 39    With respect to all seven of the postconviction claims, Carroll argued that the assertions of ineffective assistance of trial counsel involved "various shortcomings which were not a part of the trial record and therefore could not have been raised on direct appeal and have not been forfeited." Carroll attached numerous documents that were not contained in the trial record to support his claims, including his own lengthy affidavit, which made assertions regarding trial counsel that were relevant to all seven claims.

¶ 40    In support of claim (1), Carroll stated in his affidavit that Golike questioned him on September 29, 2010, without providing adequate *Miranda* warnings (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) and without allowing him to speak with his attorney, Curtis Dawson. Carroll asserted that he had retained Dawson prior to the interview with police and that Golike was aware of that fact but that Golike nevertheless pressed forward with the interview and did not honor Carroll's request to speak with his attorney. To further support claim (1), Carroll attached an affidavit from Dawson to his petition in which Dawson confirmed that he was representing Carroll on September 29, 2010, and that Golike knew about the representation.

Carroll also attached to his petition an Alton Police Department policy manual that set forth various requirements for conducting police interrogations.

¶ 41    In support of claim (2), Carroll asserted in his affidavit that he asked his trial counsel before trial to perform radiocarbon dating of the bone fragments found on his property to determine their age and whether the fragments predated the time Woodward disappeared and the time Carroll began living on the property. Carroll stated that he purchased his property in 1995, developed it for several years, and did not live there until 1999. Carroll also attached to his petition an affidavit from Dr. Alexander Cherkinsky, an expert in radiocarbon dating. In his affidavit, Cherkinsky stated that two bone fragments taken from Carroll's property possessed sufficient radiocarbon for testing. Cherkinsky concluded that a bone fragment from quadrant one more likely than not came from a "species" that died between 1996 to 1998. A bone fragment from quadrant two more likely than not came from a "species" that died between 1991 and 1994. To further support claim (2), petitioner attached a copy of the deed to his property, which indicated that Carroll did not purchase the property until 1995, along with an affidavit from Carroll's mother, Jean Carroll. In her affidavit, Jean stated that trial counsel told her there was no need to subject the bone fragments to radiocarbon dating because the bone fragments would not be admitted into evidence.

¶ 42    In support of claim (3), Carroll asserted in his affidavit that he urged trial counsel to introduce testimony from some of Woodward's coworkers who saw her in the employee parking lot prior to her disappearance in order to undermine the in-court identification of Carroll made by Wanda Bausily. Carroll attached to his petition the affidavit of April Cathers, a coworker of Woodward's, in which she stated that the man she saw in the parking lot was five feet, six inches or five feet, seven inches tall. Cathers also stated that she was the "only person out on the parking lot at that time" and that Wanda Bausily was not "anywhere near" Woodward. Carroll also asserted in his affidavit that he weighed approximately 200 pounds and was six feet, one inch tall at the time of Woodward's disappearance. In further support of claim (3), Carroll also attached the photo lineup shown to the parking lot witnesses.

¶ 43    In support of claim (4), Carroll asserted in his affidavit that trial counsel failed to review all the test samples of DNA material retrieved by law enforcement

authorities during their investigations into Woodward's disappearance. Carroll further asserted that he had been excluded as the source of any of those DNA samples and that trial counsel failed to argue that fact at trial.

¶ 44     In support of claim (5), Carroll asserted in his affidavit that he had numerous conversations with trial counsel about requesting a change of venue due to adverse pretrial publicity that would taint the jury pool. He also attached to his petition multiple newspaper articles that discussed the disappearance of Woodward and the legal proceedings against Carroll. In further support of claim (5), Jean Carroll stated in her affidavit that she spoke with trial counsel about seeking a change of venue but that counsel told her they did not want to seek a change of venue because they could "potentially receive another unknown trial judge with more conservative views" than the judge who was currently presiding over the case.

¶ 45     In support of claim (6), Carroll asserted that trial counsel hired a fingerprint expert to challenge the State's fingerprint evidence, but the expert was never called to testify. He also attached to his petition a copy of a $2,000 check payable to the purported fingerprint expert. In further support of claim (6), Jean Carroll stated in her affidavit that she paid trial counsel to hire a fingerprint expert.

¶ 46     In support of claim (7), Carroll attached to his petition a 2013 news article that referred to the unknown suspect seen in the parking lot as "a smoker." Carroll also stated in his affidavit that he was not a smoker.

¶ 47     The circuit court advanced Carroll's postconviction petition to the second stage of postconviction proceedings. The State responded with a motion to dismiss, asserting that Carroll's claims either lacked merit or were forfeited because they could have been raised on direct appeal but were not. The circuit court granted the motion. The circuit court determined that claims (3) through (7) of the petition relied on "statements and information known to or readily available to" Carroll and trial counsel at the time of trial and thus could have been raised on direct appeal. The court therefore found those claims forfeited. With respect to the first and second claims, the circuit court denied them on their merits, determining that they failed to set forth a substantial showing of a constitutional violation. Accordingly, the circuit court dismissed the petition. Carroll appealed.

¶ 48 On appeal, Carroll was represented by new counsel. Carroll argued that the circuit court erred in failing to advance the first and second claims of the postconviction petition to third-stage proceedings and erred in finding claims (3) through (7) forfeited. Carroll also argued that postconviction counsel labored under an actual conflict of interest when, in his representation of Carroll as postconviction counsel, he did not and could not allege his own ineffective assistance as appellate counsel for failing to raise the forfeited postconviction claims (claims (3) through (7)) on direct appeal. According to Carroll, a remand to the circuit court was thus required for the appointment of a new, conflict-free, postconviction attorney who could properly assert the ineffective assistance of appellate counsel with respect to those claims. Finally, Carroll argued that his postconviction counsel provided unreasonable assistance in failing to properly present Carroll's claims and that this also required a remand to the circuit court for new second-stage proceedings with new counsel.

¶ 49 The appellate court affirmed the dismissal of Carroll's postconviction petition. 2024 IL App (4th) 231207. The appellate court first concluded that all of Carroll's claims of ineffective assistance of trial counsel, including claims (1) and (2), were forfeited. According to the appellate court, all of Carroll's postconviction claims relied on facts that were either "derived from the record or were known by defendant, and thus available to counsel on direct appeal." *Id.* ¶ 53. Under this standard, the appellate court reasoned, Carroll's claims could have been raised on direct appeal and were therefore forfeited.

¶ 50 The appellate court also rejected Carroll's contention that postconviction counsel was laboring under an actual conflict of interest and that the case had to be remanded to the circuit court for the appointment of a new attorney who could properly assert the ineffective assistance of Carroll's counsel on direct appeal. *Id.* ¶¶ 66-81. To establish whether there was a conflict, the appellate court determined it had to look to the merits of the underlying claims of ineffective assistance of trial counsel. *Id.* According to the appellate court, if the underlying claims lacked merit, then appellate counsel was not obligated to raise them on direct appeal and there could be no conflict of interest. *Id.* ¶ 81. The appellate court reviewed the merits of Carroll's claims of ineffective assistance of trial counsel and concluded that none of them set forth a substantial showing of a constitutional violation. *Id.* ¶¶ 84-114. Accordingly, the appellate court held that postconviction counsel was not laboring

under a conflict and there was no need to remand the case to the circuit court for the appointment of new counsel. *Id.* ¶ 114.

¶ 51    Finally, the appellate court also rejected Carroll's contention that his postconviction counsel had provided unreasonable assistance by failing to properly present Carroll's claims. *Id.* ¶¶ 60-65. The appellate court held that Carroll was unable to show how he was prejudiced by the claimed errors of counsel and, thus, there was no need to remand for further proceedings on this basis. *Id.* ¶¶ 64-65. Accordingly, the appellate court affirmed the circuit court's dismissal of Carroll's postconviction petition. *Id.* ¶ 116. This court allowed Carroll's petition for leave to appeal pursuant to Illinois Supreme Court Rule 315(a) (eff. Dec. 7, 2023).

¶ 52                                              ANALYSIS

¶ 53    At issue in this appeal is whether the circuit court correctly dismissed Carroll's postconviction petition. We review *de novo* the circuit court's dismissal of a postconviction petition. *People v. Williams*, 2025 IL 129718, ¶ 41.

¶ 54    The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 to 122-9 (West 2024)) provides for a three-stage process for adjudicating postconviction petitions. *Williams*, 2025 IL 129718, ¶ 42. At the first stage, the circuit court must independently review the petition and determine whether it is "frivolous or is patently without merit." 725 ILCS 5/122-2.1(a)(2) (West 2024). If the court determines that the facts alleged in the petition state an arguable claim of a constitutional deprivation, the petition advances to the second stage. *Williams*, 2025 IL 129718, ¶ 42. At that stage, the court may appoint counsel to assist an indigent defendant. 725 ILCS 5/122-4 (West 2024). Additionally, at that stage, the State may file a motion to dismiss or an answer to the petition. *Id.* § 122-5; *Williams*, 2025 IL 129718, ¶ 42. In evaluating a motion to dismiss, the circuit court must determine whether the petition and supporting documentation make a substantial showing of a constitutional violation. *Williams*, 2025 IL 129718, ¶ 42. If so, the petition advances to the third stage for an evidentiary hearing. *Id.* If not, the petition should be dismissed. *Id.*

I. Forfeiture

¶ 56     In both the circuit and appellate courts in this case, the State argued that Carroll's petition should be dismissed because all of his postconviction claims could have been raised on direct appeal and, therefore, were forfeited. The appellate court, as noted, agreed with this contention.

¶ 57     Before this court, however, the State no longer contends that Carroll's postconviction claims were forfeited. Instead, the State concedes that the claims were all properly before the circuit court.[1] The State then argues that Carroll's postconviction petition was nevertheless correctly dismissed by the circuit court because none of the postconviction claims make a substantial showing of a constitutional violation and, therefore, the petition fails on its merits. We agree.

¶ 58     In a postconviction proceeding, "issues that could have been raised on direct appeal, but were not, are forfeited." *People v. English*, 2013 IL 112890, ¶ 22. However, "[b]ecause an appellant generally is limited to the record, omitting a claim in the direct appeal will not result in a forfeiture of the claim in a subsequent postconviction proceeding if the record on direct appeal did not provide the means of raising the claim." *People v. Wrencher*, 2015 IL App (4th) 130522, ¶ 23. In other words, a postconviction claim is not forfeited when the facts supporting the claim "do not appear on the face of the original appellate record." *People v. Williams*, 209 Ill. 2d 227, 233 (2004); *English*, 2013 IL 112890, ¶ 22; see *People v. Veach*, 2017 IL 120649, ¶ 47; *People v. Hall*, 157 Ill. 2d 324, 336-37 (1993); *People v.*

---

[1]We note that, in his reply brief, Carroll argues that the State cannot change its position regarding forfeiture of the postconviction claims. Carroll relies on the doctrine of judicial estoppel. Five elements are generally required for the doctrine of judicial estoppel to apply: the estopped party must have "(1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it." (Internal quotation marks omitted.) *People v. Reed*, 2025 IL 130595, ¶ 135. Judicial estoppel is an equitable doctrine that may be invoked by a court at its discretion. *People v. Hernandez*, 2016 IL 118672, ¶ 18. The doctrine does not apply in this case. First, the State's two positions were not adopted in *separate* proceedings. The appeal before this court is a continuation of the proceedings before the appellate court and the proceedings before the circuit court. See *People v. Jones*, 223 Ill. 2d 569, 598 (2006). Second, the State does not intend for the *trier of fact* to accept the truth of the facts asserted.

*Eddmonds*, 143 Ill. 2d 501, 528 (1991); *People v. Owens*, 129 Ill. 2d 303, 308-09 (1989); *People v. Smith*, 326 Ill. App. 3d 831, 839 (2001) ("If a claim of ineffective assistance of counsel is based on matters outside the record, then it could not have been raised on appeal" and thus is not forfeited for purposes of postconviction proceedings.).

¶ 59    Moreover, a claim based on what trial counsel should have done at trial may rely on proof that is not contained in the original appellate record due to counsel's allegedly deficient representation. *People v. Tate*, 2012 IL 112214, ¶ 14. Thus, " 'a default may not preclude an ineffective-assistance claim for what trial counsel allegedly ought to have done in presenting a defense.' " *Id.* (quoting *People v. West*, 187 Ill. 2d 418, 427 (1999)).

¶ 60    In this case, all of Carroll's claims of ineffective assistance of trial counsel relied on facts that were not part of the record on direct appeal and thus required substantiation by affidavits or other evidence. For example, Carroll first alleged in his postconviction petition that trial counsel was ineffective for failing to file a motion to suppress the recorded interview he gave to the police on September 29, 2010. In support of this claim, Carroll asserted in his affidavit that (1) when he was placed in the squad car, he immediately informed Golike that he wanted to have his attorney, Curtis Dawson, present for any questioning, yet Golike ignored this request; (2) Golike was aware that Carroll was represented by Dawson in another matter and that the attorney's representation also related to the disappearance of Woodward; (3) Carroll was never given his *Miranda* rights nor did he waive them; and (4) Carroll repeatedly asked trial counsel to file a motion to suppress but counsel failed to do so. Carroll also attached Dawson's affidavit to his petition, in which Dawson similarly stated that he was representing Carroll at the time he was questioned on September 29, 2010, and that Golike was aware of this fact.

¶ 61    Because neither Carroll nor Dawson testified at trial, none of this information was contained in the original appellate record, and thus it could not have provided the factual basis for a claim of ineffective assistance of trial counsel on direct appeal. It was not until Carroll filed his petition, along with its supporting affidavits, that this factual basis became available.

¶ 62    The same situation also exists with respect to the remaining claims raised in Carroll's postconviction petition. Each claim required substantiation by affidavit or

other evidence that was appended to the petition and included facts not contained in the original appellate record. As such, the omission of those claims in the direct appeal did not result in forfeiture. See *Veach*, 2017 IL 120649, ¶ 47.

¶ 63    Despite the foregoing, the appellate court in this case concluded that Carroll's claims of ineffective assistance of trial counsel were forfeited. The appellate court reached this conclusion after finding that Carroll's claims all relied on facts that were either "derived from the record *or were known by defendant*, and thus available to counsel on direct appeal." (Emphasis added.) 2024 IL App (4th) 231207, ¶ 53. For example, according to the appellate court, because Carroll knew all the facts relating to his interview with Golike at the time of the direct appeal, all claims pertaining to that interview, including whether a motion to suppress should have been filed, were also available on direct appeal. That, however, is not the correct standard for determining forfeiture.

¶ 64    In determining whether a postconviction claim has been forfeited, the question is not whether the facts supporting the claim were "known" by the defendant at the time of the direct appeal. Rather, because appellate review is generally confined to the record, the pertinent question is whether the facts "appear on the face of the original appellate record." *Williams*, 209 Ill. 2d at 233. If the postconviction claim relies on facts not of record then there is no forfeiture, "irrespective of whether [the] supporting facts [were] available as a practical matter at the time of the direct appeal." *People v. Newbolds*, 364 Ill. App. 3d 672, 676 (2006).

¶ 65    The claims of ineffective assistance of trial counsel raised in Carroll's postconviction petition relied on facts not found in the original appellate record and, therefore, were not forfeited. Accordingly, we turn to the merits of those claims and whether Carroll's postconviction petition and supporting documentation made a substantial showing of a constitutional violation. *Williams*, 2025 IL 129718, ¶ 42.

¶ 66                    II. Ineffective Assistance of Trial Counsel

¶ 67    We address claims alleging ineffective assistance of counsel according to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Logan*, 2024 IL 129054, ¶ 82. Under *Strickland*, a defendant alleging ineffective assistance of counsel must demonstrate that counsel's performance was deficient

and that the deficient performance prejudiced the defendant. *Id.* (citing *Strickland*, 466 U.S. at 687). "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (Internal quotation marks omitted.) *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

¶ 68    To prevail on a claim of ineffective assistance of counsel, a defendant must satisfy both prongs of the *Strickland* test. *Logan*, 2024 IL 129054, ¶ 83. The failure to satisfy either of the prongs is fatal to the claim. *Id.* As such, if a reviewing court determines that the defendant has failed to prove prejudice, the court need not address the deficient performance prong. *Strickland*, 466 U.S. at 697; *Logan*, 2024 IL 129054, ¶ 83.

¶ 69                                A. Motion to Suppress

¶ 70    Carroll first contends in his postconviction petition that trial counsel was constitutionally ineffective for failing to file a motion to suppress Carroll's September 29, 2010, recorded interview with police. We conclude that Carroll cannot establish either deficient performance or prejudice with respect to this claim.

¶ 71    First, judicial scrutiny of an attorney's performance is highly deferential so that a defendant attempting to show that counsel's performance was deficient must overcome a strong presumption that the challenged actions were the product of sound trial strategy. *People v. Metcalfe*, 202 Ill. 2d 544, 561 (2002) (citing *Strickland*, 466 U.S. at 689). The decision whether to file a motion to suppress is generally a matter of trial strategy and, thus, entitled to great deference. *People v. Webb*, 2023 IL 128957, ¶ 23.

¶ 72    In this case, Carroll cannot overcome the presumption that the decision not to file a motion to suppress was the product of sound trial strategy. Carroll's recorded interview with the police was exculpatory, not inculpatory with respect to Woodward's disappearance. In the interview, Carroll repeatedly denied having any contact with Woodward and repeatedly denied having any involvement with her

disappearance. In the interview, Carroll made no inculpatory statements regarding Woodward's disappearance, and Carroll has not identified any statement from the interview that harmed his defense. The recorded interview also showed that Carroll cooperated with the police at all times.

¶ 73 As the State points out, by admitting the recorded interview, trial counsel allowed the jury to see and hear Carroll deny his involvement in Woodward's disappearance without requiring Carroll to testify at trial and thereby subject himself to cross-examination. Under these facts, counsel could have reasonably determined that the benefit of having the jury hear Carroll's exculpatory declarations outweighed any risk associated with admitting the interview. Thus, the decision not to file a motion to suppress the interview was strategic and reasonable. As such, Carroll has failed to establish deficient performance.

¶ 74 In addition, Carroll cannot establish prejudice from the failure to file a motion to suppress the interview. "To establish prejudice when an ineffective assistance claim is based on trial counsel's failure to file a suppression motion, a defendant must demonstrate that the unargued suppression motion was meritorious and that a reasonable probability exists that the trial outcome would have been different had the evidence been suppressed." *Id.* Carroll cannot meet that standard.

¶ 75 As noted, Carroll's recorded interview was exculpatory with respect to Woodward's disappearance. Further, excluding the interview would have had no effect on the remaining evidence heard by the jury. Nathan Carroll testified at length as to what occurred on June 25, 2010, and described in detail how Carroll murdered Woodward and attempted to conceal that crime. Portions of Monica's testimony corroborated Nathan's testimony in that she said she observed a "huge" burn pile that both Carroll and Nathan stoked for days. In addition, she observed them using the bucket tractor to retrieve ashes from the burn site and take them toward the creek. Moreover, fingerprint evidence connected Carroll to Woodward's vehicle. Any motion to suppress would have had no effect on those evidentiary facts. We conclude that no reasonable probability exists that the trial would have had a different outcome had Carroll's recorded interview been suppressed. Accordingly, Carroll's first postconviction claim did not set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit

court.

¶ 76                    B. Radiocarbon Dating of Bone Fragments

¶ 77        As with the motion to suppress, Carroll cannot establish prejudice based on trial counsel's failure to seek radiocarbon testing of the recovered bone fragments. In his affidavit, Dr. Alexander Cherkinsky stated that only two bone fragments of the original 27 taken from Carroll's property possessed sufficient radiocarbon for testing. After testing those fragments, Cherkinsky concluded that a bone fragment from quadrant one more likely than not came from a "species" that died between 1996 to 1998. A bone fragment from quadrant two more likely than not came from a "species" that died between 1991 and 1994. Cherkinsky did not state whether the "species" was human.

¶ 78        While the radiocarbon testing showed that the only two bone fragments amenable to testing dated from before Woodward's disappearance, that testing showed nothing about the *other* 25 bone fragments recovered from the burn site at Carroll's property. The radiocarbon testing simply excludes two more fragments from the group of 25 non-DNA-tested bone fragments, leaving 23 remaining fragments that may or may not have come from Woodward. Further, even if the radiocarbon testing results had been introduced at trial, the jury still would have heard Nathan's testimony and the remaining evidence of Carroll's guilt introduced by the State. Given the other evidence of Carroll's guilt and the limited probative value of the radiocarbon testing, Carroll has failed to demonstrate a reasonable probability of a different outcome at trial. Accordingly, Carroll's second postconviction claim did not set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 79               C. Remaining Five Claims of Ineffective Assistance
                               of Trial Counsel

¶ 80        The remaining five claims of ineffective assistance of trial counsel need only be addressed briefly. In claim (3), Carroll alleged that trial counsel was ineffective for not introducing additional testimony from Woodward's coworker, April Cathers, in order to undermine the in-court identification of Carroll made by Wanda

Bausily. In support, Carroll attached an affidavit from Cathers to his postconviction petition. However, the additional information contained in the affidavit is of little evidentiary value. In the affidavit, Cathers states that she was the "only person out on the parking lot" at the time she saw a man next to Woodward's truck, but she does not state that Bausily *never* had the opportunity to see the man. To the contrary, Cathers acknowledges in her affidavit that both she and Bausily were working at the nursing home the day Woodward disappeared and that both were dismissed from work at the same time. Further, Cathers's statement that the man she saw in the parking lot was five feet, six inches or five feet, seven inches tall merely repeated her testimony at trial. Cathers's affidavit also does nothing to undermine the remaining evidence introduced against Carroll. Nor does it negate Bausily's in-court identification of Carroll as the person she saw in the employee parking lot. We thus conclude there is no reasonable probability that, had the additional information contained in Cathers's affidavit been introduced at trial, it would have changed the outcome. Accordingly, this claim fails to set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 81    In claim (4), Carroll asserted that trial counsel failed to review all the test samples of DNA material retrieved by law enforcement authorities during their investigations into Woodward's disappearance, that Carroll had been excluded as the source of any of those DNA samples, and that trial counsel failed to argue that fact at trial. However, the State never introduced *any* DNA evidence at trial, and it is clear the jury was aware there was no DNA evidence connecting Carroll to Woodward's disappearance and murder. Indeed, trial counsel consistently highlighted the *absence* of DNA evidence at trial and argued that the absence of DNA evidence was a more important fact than the testimony of the witnesses offered by the State. Additional focus on the lack of DNA evidence would have added little to the defense's case. There is thus no reasonable probability that, had trial counsel reviewed all the DNA test samples, it would have changed the outcome of the trial. Accordingly, this claim fails to set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 82    In claim 5, Carroll argued that trial counsel failed to move for a change of venue based on pretrial publicity. However, both Carroll's and his mother's affidavits show that this decision was a matter of trial strategy. This claim therefore also fails

to set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 83    In claim (6), Carroll asserted that trial counsel hired a fingerprint expert, paid for by Carroll's mother, to testify in general about problems with fingerprint analysis but then failed to have the expert testify at trial. However, trial counsel extensively cross-examined the State's fingerprint witness, Amy Hart, with respect to the general challenges involved in fingerprint analysis and specifically emphasized that erroneous identifications can occur. In addition, trial counsel argued in both opening and closing arguments the unreliability of fingerprint evidence and that mistakes can occur during the comparison process. We cannot say that more repetition of the same issues with fingerprint analysis would have probably changed the result of the trial. Accordingly, this claim fails to set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 84    Finally, in claim (7), Carroll asserted that trial counsel failed to follow up on a news article that referred to the unknown suspect seen in the nursing home parking lot as "a smoker." However, even accepting that some person stated he or she saw "a smoker" in the parking lot, that fact would have had no effect on any of the other evidence introduced by the State at trial. We conclude there is no reasonable probability that this singular fact would have changed the result of the trial. Accordingly, this claim fails to set forth a substantial showing of a constitutional violation and was properly dismissed by the circuit court.

¶ 85    Based on the foregoing, we find that, with respect to all seven postconviction claims, Carroll cannot satisfy the *Strickland* standard for establishing that trial counsel rendered ineffective assistance. Therefore, none of the claims raised in the postconviction petition set forth a substantial showing of a constitutional violation. As such, the circuit court did not err in dismissing Carroll's postconviction petition.

¶ 86            III. Reasonable Assistance of Postconviction Counsel

¶ 87    Carroll also contends that he received unreasonable assistance of postconviction counsel during the postconviction proceedings in the circuit court. In postconviction proceedings, there is no constitutional right to counsel. See

*Pennsylvania v. Finley*, 481 U.S. 551 (1987). However, this court has determined that the Act requires postconviction counsel to provide a reasonable level of assistance. *Williams*, 2025 IL 129718, ¶ 43; *People v. Agee*, 2023 IL 128413, ¶ 41; *People v. Cotto*, 2016 IL 119006, ¶ 30; *People v. Turner*, 187 Ill. 2d 406, 410 (1999). The same standard applies to both appointed counsel and retained counsel at the second stage of postconviction proceedings. *Williams*, 2025 IL 129718, ¶ 43; *Cotto*, 2016 IL 119006, ¶ 40. "Whether counsel has provided a reasonable level of assistance will necessarily depend on the unique facts of each case." *Williams*, 2025 IL 129718, ¶ 43.

¶ 88    In this case, Carroll contends that postconviction counsel provided unreasonable assistance because (1) counsel failed to shape the postconviction claims into proper legal form and provide evidentiary support for the claims, (2) counsel was not completely familiar with the record, and (3) counsel failed to factually support and timely respond to the State's motion to dismiss. We disagree.

¶ 89    Carroll's postconviction counsel correctly placed the seven postconviction claims within the *Strickland* framework for a claim of ineffective assistance of counsel and correctly appended support for each claim to the postconviction petition. Counsel made appropriate and cohesive arguments at the hearing on the State's motion to dismiss the postconviction petition. Although Carroll's postconviction petition was ultimately unsuccessful, that fact does not establish that counsel rendered unreasonable assistance. *Id.* ¶ 49 (citing *People v. Perkins*, 229 Ill. 2d 34, 51 (2007)). We conclude that postconviction counsel reasonably shaped and supported Carroll's postconviction claims.

¶ 90    Finally, while Carroll asserts that postconviction counsel was not familiar with the record and failed to respond properly to the State's motion to dismiss, Carroll does not provide any argument or record citations in support of these assertions. Accordingly, we conclude that postconviction counsel did not render unreasonable assistance of counsel.

¶ 91                                                                CONCLUSION

¶ 92        For the foregoing reasons, the judgment of the appellate court, which affirmed the judgment of the circuit court, is affirmed.

¶ 93        Judgments affirmed.

¶ 94        JUSTICE TAILOR took no part in the consideration or decision of this case.