2026 IL App (1st) 241505

FIRST DISTRICT,
SIXTH DIVISION
June 26, 2026

No. 1-24-1505

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County, Illinois. |
| | ) | |
| v. | ) | No. 20 CR 0626501 |
| | ) | |
| LOVELL POLK, | ) | Honorable |
| | ) | Sophia Atcherson, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE GAMRATH delivered the judgment of the court, with opinion.
Presiding Justice C.A. Walker and Justice Pucinski concurred in the judgment and opinion.

**OPINION**

¶ 1        On June 7, 2020, defendant Lovell Polk threatened his family with a gun, fired the gun inside the home, and fled. After officers investigated the premises, Polk returned and shot Officer Nathaniel Hollis in the chest. Following a simultaneous jury and bench trial, the jury convicted Polk of attempted first degree murder of a peace officer, aggravated battery with a firearm, and reckless discharge of a firearm. The trial court convicted Polk of unlawful use of a weapon by a felon (UUWF) and armed habitual criminal (AHC) based in part on his 2006 conviction for conspiracy to commit murder.

¶ 2        Polk was sentenced to concurrent sentences of 48 years' imprisonment for attempted murder (28 years plus 20 years for personally discharging a firearm), 18 years for AHC, and 3 years for reckless discharge of a firearm. Polk appeals, arguing (1) his prior conviction for conspiracy to commit murder is not a forcible felony and, thus, not a predicate offense for AHC,

and (2) trial counsel was ineffective for failing to argue his mental health in mitigation at sentencing. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                         A. Trial

¶ 5        The evidence at trial established that around 11:00 p.m. on June 7, 2020, Officers Hollis and Niko Lopez received a domestic-related call for shots fired at a residence. The shots fired by Polk could be heard on the 911 call. When the police arrived, they spoke with Polk's mother Gwendolyn, sister Taranika, and nephew Tavonte. They searched the house for Polk but did not see him.

¶ 6        About 45 minutes later, Hollis and Lopez were wrapping up their investigation and talking with the family about next steps in the dining room. Hollis saw Tavonte walk towards the kitchen and then walk backwards towards the dining room with a "terrified look on his face." Hollis drew his weapon, rounded a wall, and saw Polk aiming a firearm at him. Polk fired at Hollis. Hollis, wearing a bullet-proof vest, was knocked backward into furniture. He survived.

¶ 7        Polk fled, and Hollis and Lopez gave chase. Lopez looked down an alley and saw someone riding in the distance on a bike, which he described over the police radio. Other responding officers apprehended Polk nearby after he fell off the bike. Those officers saw Polk toss a firearm out of his left pocket. Hollis arrived shortly thereafter and identified Polk as the man who shot him.

¶ 8        Outside the jury's presence, the State introduced Polk's certified convictions for conspiracy to commit murder, UUWF, and aggravated UUWF. On July 13, 2023, the trial court convicted Polk of AHC and UUWF, and the jury convicted him of attempted first degree murder of a peace officer, aggravated battery with a firearm, and reckless discharge of a firearm.

¶ 9                    B. Retrospective Behavioral Clinical Examination (BCX)

¶ 10          The parties were to proceed to posttrial motions and sentencing on August 11, 2023. However, Polk's presentence investigation report (PSI) raised questions of his fitness and sanity based on Polk self-reporting that he was diagnosed with bipolar disorder and schizophrenia around 10 or 12 years old. Though the trial court "did not note any issue with respect to [Polk] being unable to understand and appropriately answer the Court's questions," it ordered a retrospective BCX. Polk's counsel agreed to the retrospective BCX, despite not having any prior indication "that something might be wrong."

¶ 11          On April 3, 2024, Dr. Sarah Anderson filed an opinion letter based on her BCX of Polk and attached a 10-page psychiatric addendum, summarizing Polk's mental health history based on her review of various records. In short, records from July 2016 through August 2023 reveal Polk's pattern of reporting psychiatric symptoms, including bipolar disorder, schizophrenia, and hallucinations, that frequently conflicted with clinical findings and Polk's inconsistent symptoms and response to internal stimuli. While he was prescribed fluoxetine, Seroquel, and olanzapine for diagnoses such as mood disorder and major depression with psychotic features, multiple evaluations noted no objective signs of acute psychosis or cognitive impairment. Notably, clinical staff consistently documented concerns regarding Polk's malingering, medication-seeking behavior, and the exaggeration of symptoms to secure specific housing in the residential treatment unit (RTU). Polk frequently appeared stable, goal-directed, and future-oriented during examinations. Despite reports of auditory hallucinations, none were command related and Polk confirmed that the voices do not instruct him to harm himself or others.

¶ 12          After conducting a comprehensive evaluation, Dr. Anderson concluded that Polk was mentally fit to stand trial with medication and was legally sane at the time of the offense.

¶ 13    Polk reported to Dr. Anderson that he had been off his medication for three or four days prior to the incident due to looting at his pharmacy. Polk stated that he felt irritated and subsequently smoked PCP, used ecstasy, and consumed alcohol, leading to a blackout during the time of the offense. Despite these factors, Dr. Anderson determined there was no evidence that Polk was experiencing or displaying symptoms of mental illness that would have caused him to lack the substantial capacity to appreciate the criminality of his conduct.

¶ 14               C. Sentencing

¶ 15    At Polk's sentencing hearing, the trial court confirmed its receipt of Dr. Anderson's letter and addendum and summarized her findings on the record. In aggravation, the State argued Polk's extensive mental health records show he is a manipulator that exaggerates his symptoms to remain in the RTU. Polk's counsel responded that though Polk's conduct "[does not] rise[ ] to the level of mental illness and insanity," he was not acting in a goal-directed, rational manner. Counsel pointed out that Polk was on drugs, was not thinking rationally or intelligently, and did not plan to try to kill Hollis. Counsel also addressed Polk reportedly talking to his deceased father, stating, "That's not proof that he's a bad man. That's somewhat of an admirable thing *** when your parents die you talk to them and you're inspired by and influenced by them ***." Counsel also argued Polk's health could be at risk from a higher sentence due to his diabetes and high blood pressure.

¶ 16    In imposing sentence, the trial court noted it "was never under any bonafide doubt as to [Polk's] fitness, *** [but] we did have additional evaluations conducted with respect to any mental health. *** I have reviewed those reports as they've been returned, and so I will take into consideration the fact that you have some physical medical conditions that potentially would be mitigating and endanger your medical conditions with imprisonment." However, "those medical

conditions *** are treatable and manageable." The only factors the court found in mitigation were Polk's educational and work history and "those medical, physical issues and diagnoses." The court imposed concurrent sentences of 48 years' imprisonment for attempted murder (28 years plus 20 years for personally discharging a firearm), 18 years for AHC, and 3 years for reckless discharge of a firearm. Polk appeals, raising two discrete issues addressed below.

¶ 17                                            II. ANALYSIS

¶ 18                        A. AHC Predicated on Conspiracy to Commit Murder

¶ 19        First, while Polk accepts that the evidence showed he possessed a firearm for his AHC conviction, he contends that conspiracy to commit murder is not a predicate offense for AHC. We disagree.

¶ 20        A person commits AHC when he possesses any firearm after having been convicted two or more times of, among other things, a forcible felony as defined in section 2-8 of this Criminal Code of 2012 (Criminal Code). 720 ILCS 5/2-8, 24-1.7 (West 2020). Under section 2-8 of the Criminal Code, a "forcible felony" includes specific felonies and any other felony involving physical force or violence against any individual. *Id.* § 2-8. Polk claims conspiracy to commit murder is not a forcible felony because it is not listed as an enumerated offense or covered by the residual clause. We review this legal issue *de novo*. *People v. Thomas*, 407 Ill. App. 3d 136, 139 (2011).

¶ 21        A felony involves the threat of force or violence if the defendant contemplated violence might be needed to commit the crime. *Id.* at 140 (citing *People v. Belk*, 203 Ill. 2d 187, 194 (2003)). It qualifies as forcible when an element is the specific intent to commit a violent act (*id.* at 139-40) or, if violent intent is not explicit, when the State proves the defendant contemplated and was willing to use force or violence. See *Belk*, 203 Ill. 2d at 195-96.

¶ 22    Polk's argument that conspiracy to commit murder is not a forcible felony is foreclosed by our prior decision, where he contested his UUWF conviction using the same conspiracy to commit murder conviction at issue now. See *People v. Polk*, 2014 IL App (1st) 122017. We expressly held "[c]onspiracy to commit murder qualifies as a forcible felony" under section 2-8. *Id.* ¶¶ 25, 28. On rehearing, Polk challenged this conclusion. *Id.* ¶ 42. Drawing on *Thomas*, 407 Ill. App. 3d at 137, which determined that all attempted murders qualify as forcible felonies, we reaffirmed our position. We concluded that conspiracy to commit murder "necessarily contemplates that violence would be necessary to enable the conspirators to carry out their common purpose, *i.e.*, murder, and it is wholly irrelevant whether the object of the conspiracy was ever completed or attempted." *Polk*, 2014 IL App (1st) 122017, ¶ 54.

¶ 23    Polk urges us to overrule our prior decision because conspiracy to commit murder is an inchoate offense, like attempt or solicitation; thus, it "cannot be considered a forcible felony without proof of the underlying facts of the conviction." However, whether an offense is inchoate is not determinative. Rather, it is the inherently violent nature of the offense that gives rise to a forcible felony. See *Thomas*, 407 Ill. App. 3d at 137 ("every attempted murder conviction [qualifies] as a forcible felony" for AHC); *People v. Brown*, 2017 IL App (1st) 150146, ¶¶ 21-22 ("attempted armed robbery qualifies as an inherently forcible felony" because a "defendant necessarily demonstrated the requisite contemplation or willingness to use force"); *cf. People v. Sanderson*, 2016 IL App (1st) 141381, ¶ 9 (attempted residential burglary is not a forcible felony, "since its elements do not include a specific intent to carry out a violent act").

¶ 24    In *Thomas*, 407 Ill. App. 3d at 140, the court found that attempted murder is an inherently forcible felony because it requires proof that the defendant specifically intended to kill and took a substantial step toward committing murder. This specific intent implies sufficient force to

cause serious injury or death. *Id.* Similarly, conspiracy to commit murder requires an agreement and an act in furtherance of that agreement with intent to kill. 720 ILCS 5/8-2(a) (West 2020); *People v. Hopp*, 209 Ill. 2d 1, 14 (2004) ("conspiracy to commit first degree murder requires intent to kill"). Thus, every conspiracy to commit murder necessarily involves the use of force or its threat, as the State must prove the defendant's intent to kill.

¶ 25　　　　Polk overlooks the specific intent element, arguing conspiracy to commit murder can be accomplished through the purchase of a weapon or surveillance, which would not "necessarily involve the use or threat of violence." However, the contemplation of the use or threat of force is inherent in every conspiracy to commit murder. It does not matter whether that force was actually carried out. As we observed in *Thomas*, the definition of forcible felony in section 2-8 does not require the actual infliction of physical injury; instead, it only requires defendant to have contemplated that the use of threat, physical force, or violence might be necessary to carry out the crime. *Thomas*, 407 Ill. App. 3d at 140. As such, Polk's argument does not persuade us to reverse our prior ruling that conspiracy to commit murder qualifies as a forcible felony under section 2-8 of the Code.

¶ 26　　　　In reaching this conclusion, we are not persuaded by Polk's assertion that, pursuant to *People v. Mosley*, 2023 IL App (1st) 200309, the record must reflect specific circumstances demonstrating force in the prior offense. Under the residual clause for unenumerated offenses, the State need not present evidence of specific circumstances if the offense is inherently a forcible felony. Unlike attempted robbery, conspiracy to commit murder is inherently violent and by its nature dangerous to human life. It contemplates a willingness to use lethal force and is thus a forcible felony regardless of the underlying facts. For these reasons, we reject Polk's argument that his prior conviction for conspiracy to commit murder is not a valid predicate for AHC.

¶ 27                               B. Ineffective Assistance of Counsel

¶ 28        Next, Polk argues counsel was ineffective in failing to argue his mental health in mitigation at sentencing. To establish a claim for ineffective assistance of counsel, Polk must show counsel's performance was deficient and the deficient performance resulted in prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *People v. Albanese*, 104 Ill. 2d 504, 526-27 (1984). Deficient performance occurs when counsel's representation falls below an objective standard of reasonableness and prejudice results if there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 688, 694. Polk cannot establish either prong.

¶ 29        "[J]udicial scrutiny of an attorney's performance is highly deferential so that a defendant attempting to show that counsel's performance was deficient must overcome a strong presumption that the challenged actions were the product of sound trial strategy." *People v. Carroll*, 2026 IL 131360, ¶ 71. The decision as to what matters to argue in mitigation is generally a matter of trial strategy, entitled to great deference. *People v. Edwards*, 195 Ill. 2d 142, 173 (2001) (counsel's failure to offer certain evidence in mitigation was matter of trial strategy and did not support ineffective assistance claim); *People v. Cloutier*, 191 Ill. 2d 392, 404-05 (2000) (failure at sentencing phase to investigate or present certain evidence in mitigation was trial strategy, not ineffective assistance). Given this record, which highlights potential drawbacks of using Polk's mental health as mitigating evidence, we infer that counsel's decision was driven by trial strategy and did not constitute ineffective assistance.

¶ 30        Polk's mental-health records portray him as an unreliable historian with a pattern of malingering and a demonstrated preference for remaining in the RTU for his own comfort. Most of the psychological symptoms documented in the records were based on Polk's self-reports

rather than objective clinical observations. Given Polk's inconsistent reporting, his history of exaggerating symptoms, and descriptions of him as "forward thinking," "med seeking," and motivated by comfort, trial counsel's choice to avoid relying on mental-health evidence in mitigation was a reasonable strategic decision rather than deficient performance.

¶ 31      Moreover, courts have recognized that evidence of mental health issues is a double-edged sword that could be used in mitigation and aggravation. Because of this, a defense attorney must always make a strategic decision whether to present this evidence and, in most cases, the decision does not give rise to an ineffective assistance claim, particularly where the evidence could be considered aggravating. See *People v. Cotton*, 2023 IL App (1st) 211081-U, ¶ 32 (rejecting ineffective assistance claim where counsel did not present mitigating evidence of mental illness or link between lack of medication and substance abuse at the time of the offense); *People v. Romero*, 2022 IL App (2d) 191106-U, ¶ 36 (defendant failed to establish that trial counsel was arguably ineffective for not presenting additional evidence on the role of his mental illness in the murder). In Polk's case, both defense counsel and the court noted Polk had not demonstrated mental health issues during proceedings, and records caused some skepticism about their truth and severity. At sentencing, the State effectively challenged the credibility of his mental health history, making it reasonable strategy for defense counsel to shift focus away from it.

¶ 32      Nonetheless, even assuming there was a deficient performance in failing to present evidence of Polk's mental health, Polk was not prejudiced because there is no reasonable probability that this evidence would have changed the result of the sentencing hearing.

¶ 33      Mental illness alone is not inherently mitigating for sentencing purposes. *People v. Yelm*, 2023 IL App (2d) 210095-U, ¶ 81. It deserves weight in sentencing only if the

"serious mental illness" "substantially affected" the defendant's "ability to understand the nature of his or her acts or to conform his or her conduct to the requirements of the law." 730 ILCS 5/5-5-3.1(a)(16) (West 2022); *People v. Smallwood*, 2024 IL App (5th) 210407, ¶¶ 41-45. The trial court reviewed the retrospective BCX and Dr. Anderson's comprehensive report, containing all evidence of Polk's mental health history, and reasonably declined to treat that history as a mitigating factor. The record contains no evidence that Polk's diagnosed conditions impaired his ability to understand his actions, appreciate their criminality, or conform his conduct to the requirements of the law, nor is there any indication that his mental health played any role in the shooting. In fact, Dr. Anderson expressly concluded that Polk was legally sane at the time of the offense and that his mental illness had no impact on his behavior or judgment during the incident.

¶ 34      Polk's main diagnoses were depression and major depressive disorder with some psychosis-related features, like hallucinations. However, he never reported experiencing command hallucinations directing him to harm himself or others or otherwise affecting his judgment. By contrast, Polk's use of PCP, ecstasy, and alcohol immediately before the offense provides a far more plausible explanation for any impaired judgment at the time of the shooting.

¶ 35      Polk's reliance on *People v. Robinson*, 221 Ill. App. 3d 1045 (1991), and *People v. Williams*, 62 Ill. App. 3d 966 (1978), is misplaced. In *Robinson*, the defendant's sentence was reduced because the trial court overlooked an extensive, well-documented history of severe mental illness, including two psychiatric hospitalizations, one before the offense and another during trial, and a diagnosis of schizoaffective disorder. *Robinson* also involved a defendant with no criminal history, and the sentencing court compounded its error by relying on the criminal conduct of others. *Williams* involved multiple mitigating factors beyond the defendant's mental

health: the defendant was only 19 years old, had no prior criminal record, came from a profoundly unstable home, and was the parent of a young child.

¶ 36        Unlike the defendants in *Robinson* and *Williams*, Polk does not present a clean mitigating profile. He has a significant criminal history, history of drug and alcohol abuse, and his mental-health records contain numerous indications of malingering, inconsistent self-reporting, and symptom exaggeration. As documented in the record, Polk was frequently described as "forward thinking," "med seeking," and motivated by comfort rather than genuine psychiatric distress. His claimed symptoms were typically unsupported by objective clinical findings, and he displayed no signs that any diagnosed mental condition impaired his ability to understand his actions or conform his conduct to the law. Moreover, there is no evidence connecting Polk's diagnoses to the decision to shoot Hollis.

¶ 37        Given these stark differences, the mitigating considerations that justified reduced sentences in *Robinson* and *Williams* are simply not present here. Polk's mental-health history, standing alone, is not mitigating, and nothing in the record supports a reasonable probability that additional mental-health argument at sentencing would have resulted in a lower sentence. Accordingly, Polk cannot establish prejudice, and his ineffective assistance claim fails.

¶ 38                                III. CONCLUSION

¶ 39        For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 40        Affirmed.

*People v. Polk*, **2026 IL App (1st) 241505**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 20-CR-0626501; the Hon. Sophia Atcherson, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Carrie Darden, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Eileen O'Neill Burke, State's Attorney, of Chicago (John E. Nowak, David B. Greenspan, and Sean Lehning, Assistant State's Attorneys, of counsel), for the People. |